**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard, 16th Floor
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Baymont Franchise Systems, Inc.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| BAYMONT FRANCHISE SYSTEMS, INC., a Delaware Corporation, | : : | Civil Action No. 16- |
| Plaintiff, | : | **COMPLAINT** |
| v. | : | |
| ZRII, LLC, a Pennsylvania limited liability company; and NILESH PATEL, an individual, | : : | |
| Defendants. | : | |
| | : | |
| | : | |

Plaintiff Baymont Franchise Systems, Inc., by its attorneys, LeClairRyan, complaining of defendants ZRII, LLC and Nilesh Patel, says:

**PARTIES, JURISDICTION AND VENUE**

1.    Plaintiff Baymont Franchise Systems, Inc. ("BFS") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.

2.    Defendant ZRII, LLC ("ZRII"), on information and belief, is a limited liability company organized and existing under the laws of the State of Pennsylvania, with its principal place of business at  64 Brookside Drive, Holland, Pennsylvania 18966.

3.    Defendant Nilesh Patel ("Patel"), on information and belief, is a principal of ZRII and a citizen of the State of Pennsylvania, residing at 64 Brookside Drive, Holland, Pennsylvania 18966.

4.    Upon information and belief, Patel is the only constituent member of ZRII.

5.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 inasmuch as the plaintiff and all the defendants are citizens of different states and the amount in controversy in this matter, exclusive of interest and costs, exceeds the sum of $75,000.

6.    This Court has personal jurisdiction over ZRII by virtue of, among other things, section 17.6.3 of the December 3, 2013 franchise agreement by and between ZRII and BFS (the "Franchise Agreement"), described in more detail below, pursuant to which ZRII has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

7.    This Court has personal jurisdiction over Patel by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to Patel acknowledged that he was personally bound by section 17 of the Franchise Agreement.

8.    Venue is proper in this District pursuant to section 17.6.3 of the Franchise Agreement, inasmuch as that provision contains an express waiver by ZRII of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Agreements Between The Parties

9.    On or about December 3, 2013, BFS entered into the Franchise Agreement with ZRII for the operation of an 80-room Baymont® guest lodging facility located at 871 York

2

Road, Gettysburg, Pennsylvania 17325, Site No. 47614-03583-02 (the "Facility"). A true copy of the Franchise Agreement is attached hereto as Exhibit A.

10.    Pursuant to section 5 of the Franchise Agreement, ZRII was obligated to operate a Baymont® guest lodging facility for a twenty-year term.

11.    Pursuant to section 7, section 18.5 and Schedule C of the Franchise Agreement, ZRII was required to make certain periodic payments to BFS for royalties, system assessments, taxes, interest, reservation system user fees, annual conference fees, and other fees (collectively, "Recurring Fees").

12.    Pursuant to section 7.3 of the Franchise Agreement, ZRII agreed that interest is payable "on any past due amount payable to [BFS] under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

13.    Pursuant to section 3.6 of the Franchise Agreement, ZRII was required to prepare and submit monthly reports to BFS disclosing, among other things, the amount of gross room revenue earned by ZRII at the Facility in the preceding month for purposes of establishing the amount of royalties and other Recurring Fees due to BFS.

14.    Pursuant to section 3.6 of the Franchise Agreement, ZRII agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.6 and 4.8 of the Franchise Agreement, ZRII agreed to allow BFS to examine, audit, and make copies of the entries in these books, records, and accounts.

15.    Pursuant to section 11.2 of the Franchise Agreement, BFS could terminate the Franchise Agreement, with notice to ZRII, if ZRII (a) discontinued operating the Facility as a

3

Baymont® guest lodging establishment and/or (b) lost possession or the right to possession of the Facility.

16.  Pursuant to section 12.1 of the Franchise Agreement, ZRII agreed that, in the event of a termination of the Franchise Agreement pursuant to section 11.2, it would pay liquidated damages to BFS in accordance with a formula specified in the Franchise Agreement.

17.  Section 18.3 of the Franchise Agreement specifically set liquidated damages for the Facility at $850.00 for each guest room of the Facility ZRII was authorized to operate at the time of termination.

18.  Pursuant to section 17.4 of the Franchise Agreement, ZRII agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [Franchise] Agreement or collect amounts owed under this [Franchise] Agreement."

19.  Effective as of the date of the Franchise Agreement, Patel provided BFS with a Guaranty of ZRII's obligations under the Franchise Agreement.  A true copy of the Guaranty is attached hereto as Exhibit B.

20.  Pursuant to the terms of the Guaranty, Patel agreed, among other things, that upon a default under the Franchise Agreement, he would  "immediately make each payment and perform or cause [ZRII] to perform, each unpaid or unperformed obligation of [ZRII] under the [Franchise] Agreement."

21.  Pursuant to the terms of the Guaranty, Patel agreed to pay the costs, including reasonable attorneys' fees, incurred by BFS in enforcing its rights or remedies under the Guaranty or the Franchise Agreement.

**The Termination of the Franchise Agreement**

22.     On or about January 1, 2015, ZRII unilaterally terminated the Franchise Agreement by ceasing to operate the Facility as a Baymont® guest lodging facility.

23.     By letter dated January 21, 2015, a true copy of which is attached as <u>Exhibit C</u>, BFS acknowledged ZRII's unilateral termination the Franchise Agreement, effective January 1, 2015, and advised ZRII that it was required to pay to BFS as liquidated damages for premature termination the sum of $68,000.00 as required under the Franchise Agreement, and all outstanding Recurring Fees through the date of termination.

**FIRST COUNT**

24.     BFS repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 23 of the Complaint.

25.     Pursuant to sections 3.6 and 4.8 of the Franchise Agreement, ZRII agreed to allow BFS to examine, audit, and make copies of ZRII's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

26.     The calculation of the monetary amounts sought by BFS in this action is based on the gross room revenue information supplied to BFS by ZRII and, to the extent there has been non-reporting, BFS's estimate as to the gross room revenue earned by ZRII.

27.     The accuracy of this estimate cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from ZRII.

            **WHEREFORE**, BFS demands judgment ordering that ZRII account to BFS for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility from the inception through the date of termination of the Franchise Agreement.

## SECOND COUNT

28.      BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 27 of the Complaint.

29.      By letter dated January 21, 2015, BFS acknowledged ZRII's unilateral termination of the Franchise Agreement, effective January 1, 2015, due to ZRII's failure to operate the Facility as a Baymont® guest lodging facility.

30.      Section 12.1 of the Franchise Agreement provide that, in the event of termination of the Franchise Agreement due to action of the Franchisee, ZRII shall pay liquidated damages to BFS within 30 days of termination.

31.      As a result of the termination of the Franchise Agreement, ZRII is obligated to pay BFS liquidated damages in the amount of $68,000.00, as calculated pursuant to sections 12.1 and 18.3 of the Franchise Agreement.

32.      Notwithstanding BFS's demand for payment, ZRII has failed to pay BFS the liquidated damages as required in sections 12.1 and 18.3 of the Franchise Agreement.

33.      BFS has been damaged by ZRII's failure to pay liquidated damages.

**WHEREFORE**, BFS demands judgment against ZRII for liquidated damages in the amount of $68,000.00, together with interest, attorneys' fees, and costs of suit.

## THIRD COUNT

34.      BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 33 of the Complaint.

35.      By virtue of the premature termination of the Franchise Agreement, BFS sustained a loss of future revenue over the remainder of the twenty-year term of the Franchise Agreement.

6

36.     If the Court determines that ZRII is not liable to pay BFS liquidated damages as required by sections 12.1 and 18.3 of the Franchise Agreement then, in the alternative, ZRII is liable to BFS for actual damages for the premature termination of the Franchise Agreement.

37.     BFS has been damaged by ZRII's breach of its obligation to operate a Baymont® guest lodging facility for the remaining term of the Franchise Agreement.

**WHEREFORE**, BFS demands judgment against ZRII for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

38.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 37 of the Complaint.

39.     Pursuant to section 7, section 18.5 and Schedule C of the Franchise Agreement, ZRII was obligated to remit Recurring Fees to BFS.

40.     Despite its obligation to do so, ZRII failed to remit certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $81,254.51.

41.     ZRII's failure to remit the agreed Recurring Fees constitutes a breach of the Franchise Agreement and has damaged BFS.

**WHEREFORE**, BFS demands judgment against ZRII for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $81,254.51, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

42.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 41 of the Complaint.

43.     At the time of the termination of the Franchise Agreement, ZRII was obligated to pay BFS Recurring Fees.

44.     Despite its obligation to do so, ZRII failed to pay certain of the Recurring Fees due and owing under the Franchise Agreement in the current amount of $81,254.51.

45.     ZRII's failure to compensate BFS constitutes unjust enrichment and has damaged BFS.

        **WHEREFORE**, BFS demands judgment against ZRII for the Recurring Fees due and owing under the Franchise Agreement, in the current amount of $81,254.51, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

46.     BFS repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 45 of the Complaint.

47.     Pursuant to the terms of the Guaranty, Patel agreed, among other things, that upon a default under the Franchise Agreement, he would immediately make each payment and perform each obligation required of ZRII under the Franchise Agreement.

48.     Despite his obligation to do so, Patel has failed to make any payments or perform or cause ZRII to perform each obligation required under the Franchise Agreement.

49.     Pursuant to the Guaranty, Patel is liable to BFS for ZRII's liquidated damages in the amount of $68,000.00, or actual damages in an amount to be determined at trial, and ZRII's Recurring Fees due and owing under the Franchise Agreement, in the current amount of $81,254.51.

WHEREFORE, BFS demands judgment against Patel for damages in the amount of all liquidated damages, or actual damages, and Recurring Fees due and owing under the Franchise Agreement, together with interest, attorneys' fees, and costs of suit.

LeClairRyan
Attorneys for Plaintiff,
Baymont Franchise Systems, Inc.

By: _____
Bryan P. Couch

Dated: 2|25|16

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding.

LeClairRyan
Attorneys for Plaintiff,
Baymont Franchise Systems, Inc.

By: _____
Bryan P. Couch

Dated: 2|25|16

# **EXHIBIT A**

Location: **Gettysburg, PA**
Entity No.: **03583-01**
Unit No.: **47614**

### BAYMONT FRANCHISE SYSTEMS, INC.
### FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), dated _Dec. 3_, 20_13_, is between BAYMONT FRANCHISE SYSTEMS, INC., a Delaware corporation ("we", "our" or "us"), and **ZRII, LLC, a Pennsylvania limited liability company** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

1. **Franchise.** We have the exclusive right to franchise to you the distinctive "Baymont System" for providing transient guest lodging services. We grant to you and you accept the Franchise, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. The Franchise is effective only at the Location and may not be transferred or relocated. You will call the Facility a BAYMONT Inn & Suites. You may adopt additional or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

2. **Protected Territory.** We will not own, operate, lease, manage, franchise or license anyone but you to operate a Chain Facility in the "Protected Territory", defined in Appendix A, while this Agreement is in effect. We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you. We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory. While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise (i) any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate franchises or licenses the facility, and/or (ii) any timeshare resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, for any facility or business that shares directly or indirectly, common areas, amenities, recreation facilities, services, supplies or support activities with the Facility. You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities. This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its franchise with us terminates or is not renewed. You acknowledge that the Protected Territory fairly represents the Facility's trading area and that there are no express or implied territorial rights or agreements between the parties except as stated in this Section. You irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance.

1

The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only.

### 3.  Your Improvement and Operating Obligations.

3.1 **Pre-Opening Improvements.**  You must select, acquire, construct and/or renovate the Facility as provided in Schedule D.

3.2 **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and other *related services of the Facility (including those specified on Schedule B) to the public in compliance* with all federal, state and local laws, regulations and ordinances as well as System Standards. You will not operate a Food and Beverage service without our prior written consent, except for a *complimentary coffee service/continental breakfast in accordance with System Standards. You will* keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. The Facility will follow standard industry practices for safeguarding cardholder information, applicable laws and regulations, and such other requirements as we may include in the System Standards Manual or as we may otherwise communicate from time to time for such purpose. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility only with our prior written consent, which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool (if any) and other guest service facilities may not be shared with or used by guests of another lodging or housing facility. You acknowledge that any breach of System Standards for the Facility, its guest amenities, and your guest service performance is a material breach of this Agreement.

3.3 **Training.**  You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for franchisees and general managers respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay all travel, lodging, meals *and compensation expenses of the people you send for training programs, the cost of training* materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.4 **Marketing.**

3.4.1    You will participate in System marketing programs, including the Directory, if any, the Reservation System, and guest loyalty programs. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of

2

participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.4.2 You must participate in any regional marketing, training or management alliance or cooperative of Chain Lodging franchisees formed to serve the Chain Facilities in your area. We may assist the cooperative with collecting contributions. You may be excluded from cooperative programs and benefits if you do not participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.4.3 The Facility must participate in all mandatory Internet and distribution marketing activities and programs in accordance with the System Standards Manual, including any arrangements we make with third party distribution channels. You shall provide us with information about the Facility and utilize our approved photographer for taking photographs of the Facility for posting on the Chain Websites, third party travel websites and various marketing media. The content you provide us or use yourself for any Internet or distribution marketing activities must be true, correct and accurate, and you will promptly notify us in writing, in accordance with our processes that are then in effect, when any correction to the content becomes necessary. You shall promptly modify, at our request, the content of any Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards. You will discontinue any Internet or distribution marketing activities that conflict, in our reasonable discretion, with Chain-wide Internet or distribution marketing activities. You must honor the terms of any participation agreement you sign for Internet or distribution marketing activities. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet or distribution marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis. We may suspend the Facility's participation in Internet and/or distribution marketing activities if you default under this Agreement.

3.4.4 You will participate in the Wyndham Rewards program or any successor guest rewards or loyalty program we determine is appropriate and pay the Loyalty Program Charge associated with the program as set forth in Schedule C. The Wyndham Rewards Front Desk Guide sets forth additional system standards, which you agree to follow. The Front Desk Guide, including fees assessed and reimbursements rates, may be revised by us or our affiliates at any time upon thirty (30) days' prior notice.

3.5 **Governmental Matters.** You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

3.6 **Financial Books & Records; Audits.**

3

3.6.1   The *Facility's transactions must be timely and accurately recorded in accounting books and records* prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards.  You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.6.2   Upon our request, you will send to us copies of financial statements, tax returns, and other records relating to the Facility for the applicable accounting period that we require under this Agreement and System Standards.  We may notify you of a date on which we propose to audit the Facility's books and records at the Facility. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date.  You need to inform us where the books and records will be produced.  You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements for the Facility.  We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.6.3   We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.6.2 within 30 days after the date of the initial audit, (ii) you cancel two or more previously scheduled audits, (iii) you refuse to admit our auditors  during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records at the audit or send them to us as required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit.  Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.6, an "Accounting Procedure Notice."  You must also pay any deficiency in Recurring Fees, any Audit Fee, as defined in Section 4.8, we assess you for your default of Section 3.6 as described in Section 4.8, and/or other charges we identify and invoice as a result of the audit.  The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an *independent certified public accountant who is a member of the American Institute of Certified Public Accountants* addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.6.4   You shall, at your expense, prepare and submit to us by the third day of each month, a statement in the form prescribed by us, accurately reflecting for the immediately preceding month all *Gross Room Revenues* and such other data or information as we may require.  You must submit your statements to us using our on-line reporting and payment tool or through such other technology or means as we may establish from time to time.

3.7 **Inspections.**  You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept

4

under this Agreement. You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice. The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection. If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any Reinspection Fee specified in System Standards Manuals plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection. You will also be charged the Reinspection Fee if we are required to return to the Facility to inspect it as a result of your failure to complete any Improvement Obligation by the deadline established in the Punch List, as set forth in Schedule D. We may also include the results of paper and electronic customer satisfaction surveys of your guests as well as unsolicited feedback received from your guests in your final quality assurance score. We may publish and disclose the results of quality assurance inspections and guest surveys. We may, at our discretion, implement a chain-wide quality assurance/mystery shopper inspection program to be performed by a reputable third party. You must provide free lodging for the inspector(s) when he/she visits your Facility.

**3.8 Insurance.** You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual. Unless we instruct you otherwise, your liability insurance policies will name as additional insureds Baymont Franchise Systems, Inc., Wyndham Worldwide Corporation, Wyndham Hotel Group, LLC, and their current and former subsidiaries, affiliates, successors and assigns as their interests may appear. All policies must be primary and non-contributory with or excess of any insurance coverage that may be available to an additional insured.

**3.9 Conferences.** You (or your representative with executive authority, if you are an entity) will attend each Chain conference and pay the Conference Fee we set for Chain Lodging franchisees, if and when we determine to hold a Chain conference. The Chain conference may be held as part of a Wyndham Hotel Group, LLC multi-brand conference with special sessions and programs for our Chain only. Mandatory recurrent training for franchisees and managers described in Section 4.1.4 may be held at a conference. The fee will be the same for all Chain Facilities that we franchise in the United States. You will receive reasonable notice of a Chain Lodging conference. We will invoice and charge you for the Conference Fee even if you do not attend the Chain Conference.

**3.10    Purchasing.** You will purchase or obtain certain items we designate as proprietary or that bear or depict the Marks, such as signage, only from suppliers we approve. You may purchase other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

**3.11    Good Will.** You will use reasonable efforts to protect, maintain and promote the name "Baymont" and its distinguishing characteristics, and the other Marks. You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the Facility to engage in, conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners. You will participate in any Chain-wide guest service and satisfaction guaranty programs we require in

5

good faith for all Chain Facilities. You shall use your best efforts to promote usage of other Chain Facilities by members of the public. Except as provided in the System Standards Manual or if you obtain our prior written consent, which we may withhold in our sole discretion, neither you nor the Facility shall promote or advertise any competing business at the Facility including, but not limited to, any other guest lodging facility, time share resort, vacation club, residence club, fractional ownership residence, condominium/apartment leasing or rental business, or the like, unless we or one of our affiliates franchise, manage or own that business.

3.12    **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each additional guest room you may add once the Facility has 200 rooms. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.13    **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time, (but only to the extent that adequate room vacancies exist) to our representatives and members of their immediate family, but not more than three (3) standard guest rooms at the same time.

3.14    **Material Renovations.** Beginning five years after the Opening Date, we may issue a "Material Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Material Renovation") for the Facility, to be commenced no sooner than 90 days after the notice is issued. You will perform the Material Renovations as and when the Material Renovation Notice requires in a time period of 120 days or by the date specified in the Material Renovation Notice, whichever is longer. We will not issue a Material Renovation Notice within five years after the date of a prior Material Renovation Notice.

3.15    **Technology Standards & Communications.** You recognize that the System requires you to acquire, operate and maintain a computer-based property management system and provide guests with innovative technology for communications and entertainment. You must purchase the computer system and other equipment and software that we specify. We may modify System Standards to require new technology at all Chain Facilities. At our request, you shall participate in any intranet or extranet system developed for use in connection with the System. Such intranet or extranet system may be combined with that of our affiliates. You shall agree to such terms and conditions for the use of such intranet or extranet system as we may prescribe, which may include, among other things: (a) confidentiality requirements for materials transmitted via such system; (b) password protocols and other security precautions; (c) grounds and procedures for our suspension or revocation of access to the system by you and others; and (d) a privacy policy governing the parties' access to and use of electronic communications posted on electronic bulletin boards or transmitted via the system. You shall pay any fee imposed from time to time by us or a third party service provider in connection with hosting such system.

**4.    Our Operating and Service Obligations.** We will provide you with the following services and assistance:

6

**4.1 Training.** We may offer (directly or indirectly by subcontracting with an affiliate or a third party) orientation training, re-certification training, remedial training and supplemental training.

**4.1.1   General Manager Orientation Training.** We will offer at our corporate offices or at another location we designate an orientation training program. The program will not exceed two weeks in duration and will cover such topics as operating a Chain Facility, marketing and sales, financial management, guest services and people management. We may administer certain diagnostic tests via the Internet to measure the skill set of your general manager and, based in part of his/her score, offer certain Internet-based training as a supplement to the classroom training experience. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after the Opening Date. Any replacement general manager must complete orientation to our satisfaction within 90 days after he/she assumes the position. If we do not offer a place in orientation within the above time frame, your replacement general manager must attend the next program held at which we offer a place. Your general manager for the Facility must complete orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition for orientation which is payable as part of the Integration Services Fee set forth on Schedule D. If he/she does not attend orientation within 90 days after the Opening Date, and for any replacement general manager, you must pay a separate tuition at the rate then in effect for the program when your manager attends the program. We may charge you full or discounted tuition for "refresher" orientation for your general manager or for additional staff members who attend orientation with your general manager. We will charge the then in effect discounted tuition for any additional staff members who attend orientation with your general manager. We may charge you "No-Show Fees" or "Cancellation Fees" if you, your general manager or any other member of your staff (i) fails to register for and/or attend orientation by the required deadline, (ii) registers, but is a "no show", for orientation, or (iii) fails to notify us at least seven (7) days in advance that he/she will be unable to attend a scheduled program. This is in addition to the tuition you must pay us for your general manager at the then current rate when he/she attends orientation. See Section 4.1.5. You must also pay for your, your general manager and/or additional staff member's travel, lodging, meals, incidental expenses, compensation and benefits.

**4.1.2   Owner Training.** If this is your first System franchise, or you have not attended orientation within the last two (2) years, in addition to your general manager, you (or a person with executive authority if you are an entity) must attend orientation by the Opening Date. If we do not offer a place in orientation within this time period, you must attend the next program held at which we offer a place. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. If you attend the same orientation at the same time as your general manager, we will charge you tuition of $825 which is payable by the scheduled date for the program. You must also pay for your travel, lodging, meal and incidental expenses. If you are unable to attend an orientation program that you have scheduled with us, you must notify us at least seven (7) days before the start date and schedule attendance at another class to be held within the required time period. We may charge you No-Show or Cancellation Fees if you (i) fail to register for and/or attend orientation by the Opening Date, (ii) register, but are a "no show", for any scheduled orientation program, or (iii) fail to give us at least seven (7) days' notice of cancellation. In addition to No-Show and Cancellation Fees, if you do not attend orientation

7

BAY CON
Q1/13

within 90 days after the Opening Date, you will still be required to attend orientation and pay tuition at the then in effect rate. See Section 4.1.5.

4.1.3  **Remedial Training.** We may require you, your general manager and/or your staff to participate in remedial training if the Facility receives a D or F (or equivalent score) on a quality assurance inspection, a D or F +GX score on quality assurance electronic guest survey (or equivalent evaluation system), or experiences significant complaints to our customer care department or posted on third-party travel websites, distribution channels, blogs, social networks and other forums, as determined by us in our sole discretion. This training may be offered at our corporate offices, at a regional location, on-line or at the Facility. The training may be in the form of one or more classes held at different times and locations as we may require. You must pay the tuition in effect for this program when it is offered to you. If the training is provided at the Facility, you must provide lodging for our trainers. In addition, if at the time of your initial post-opening quality assurance inspection, you receive (i) a failure rating on guest room cleanliness and (ii) an average quality assurance score of F on cleanliness of guestroom category or cleanliness of bathroom category (based on a minimum of 10 electronic quality assurance guest surveys), then we may require you to take a one day, on-site remedial class on housekeeping within 60 days after the inspection. The tuition for an on-line class is currently $250, but is subject to increase in the future. The fee for an on-site customer experience assessment or training class is currently $1,300, but is subject to increase in the future.

4.1.4  **Supplemental Training.** You must subscribe to our e-learning modules and other *educational resources, accessible by you and your staff via the Internet, and pay us the annual fee* for this service. All general managers must complete recertification training at such intervals as we may establish in the System Standards Manual. You must pay us the tuition then in effect for the program. We may offer other mandatory or optional training programs for reasonable tuition or without charge. The above training could be offered in our corporate offices or other locations or held in conjunction with a Chain lodging conference. You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training. We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

4.1.5  **No Show and Cancellation Fees.** If you or your general manager, or any other member of your staff you designate, registers for a training program but fails to attend such program within the required time period, or fails to attend a training program as scheduled without *notifying us in advance, we may charge you a No-Show Fee of 50% of the tuition for the* program. If you, your general manager or any other member of your staff does not register for and attend any required training within the time period set forth in this Section 4.1 or in the System Standards Manual, we may charge you a fee of 100% of the tuition for the program. If you or any other member of your staff cancels participation in any training program less than seven (7) days before it is scheduled to be held, we may charge you a Cancellation Fee of 25% of the tuition for the program. No-Show and Cancellation Fees are in addition to the tuition you will have to pay *at the then offered rate when you or your general manager attends the program. We may assess* you additional No-Show or Cancellation Fees for continued failures by you under Section 4.1.

4.2 **Reservation System.** We will operate and maintain (directly or by contracting with an affiliate or one or more third parties) a computerized Reservation System or such technological

8

substitute(s) as we determine, in our discretion. We will use the Basic Reservation Fee included in the System Assessment Fees for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We or our approved supplier will provide software maintenance and support for the software we or an approved supplier license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us, an affiliate or the supplier, as applicable. During the Term, the Facility will participate in the Reservation System on an exclusive basis, including entering into all related technology agreements and complying with all terms and conditions which we establish from time to time for participation. The Facility may not book any reservations through any other electronic reservation system, booking engine or other technology. All information you collect or capture through your property management system shall be jointly owned by you and us. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties.

### 4.3 Marketing.

4.3.1   We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research, loyalty marketing and other marketing programs, training programs, and related activities. We will determine in our discretion: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from System Assessment Fees for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System franchisees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2   We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs.

4.3.3   We may, at our discretion, implement "group booking" programs created to encourage use of Chain Facilities for tours, conventions and the like, possibly for an additional fee.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items or services used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We may, in our discretion, change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation where it appears.

9

**4.6 Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain Facility franchisees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

**4.7 System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications which we may make available to you via our Chain intranet, in paper copies or through another medium. We will provide you with access to the System Standards Manual promptly after we sign this Agreement. We will notify you via our Chain intranet or another medium of any System Standards Manual revisions and/or supplements as and when issued as well as any other publications and policy statements in effect for Chain franchisees from time to time.

**4.8 Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.6. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.7. In connection with an audit, you will pay us any understated amount plus interest under Section 3.6. If the understated amount is three percent (3%) or more of the total amount owed during a six month period, you will also pay us an "Audit Fee" equal to the costs and expenses associated with the audit. Our inspections are solely for the purposes of checking compliance with System Standards.

**5. Term.** The Term begins on the Effective Date and expires at the end of the twentieth (20th) Franchise Year. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS. However, if applicable law requires us to offer renewal rights, and you desire to renew this Agreement, then you will apply for a renewal license at least six months, but not more than nine months, prior to the expiration date, and subject to such applicable law, you will have to meet our then-current requirements for applicants seeking a license, which may include you (i) executing our then-current form of license and other agreements, which license and other agreements may contain materially different terms and provisions (such as operating standards and fees) from those contained in this Agreement, (ii) executing a general release of us and our affiliates, in form and substance satisfactory to us, (iii) completing a property improvement plan, and (iv) paying a standard renewal fee; if then applicable.

*6.* **Application and Initial Fees.** You must pay us a non-refundable Application Fee of $1,000.00. If your franchise is for a new construction or conversion Facility, you must pay us an Initial Fee. If you are a transferee of an existing Facility or are renewing an existing franchise, you will pay us a Relicense Fee. The amount of your Initial or Relicense Fee is **$26,000.00** which shall be paid when you sign this Agreement and is fully earned when we sign this Agreement. *The Application Fee you paid in connection with this Agreement shall be credited against the amount of your Initial or Relicense Fee.*

10

### 7.  Recurring Fees, Taxes and Interest.

7.1 You will pay us certain "Recurring Fees" each month of the Term payable in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States). The Recurring Fees described in sections 7.1.1 and 7.1.2 are payable three days after the month in which they accrue, without billing or demand. Other Recurring Fees are payable at the times set forth in the Systems Standards. Recurring Fees include the following:

7.1.1  A "Royalty" equal to five percent (5%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2  A "System Assessment Fee" as stated in Schedule C, including a "Marketing Contribution" for advertising, marketing and training, and a "Basic Reservation Fee" for the Reservation System and other related services and programs, accrues from the Opening Date until the end of the Term, including during periods when reservation service is suspended. We may use the System Assessment Fees we collect, in whole or in part, to reimburse our reasonable direct and indirect costs, overhead or other expenses of providing marketing, training and reservation services. We may earn a profit on activities supported by the System Assessment Fee. You will also pay or reimburse us as described in Schedule C for "Additional Fees" such as travel and other sales agent commissions paid for certain reservation and marketing services to generate reservations at the Facility plus a reasonable service charge, fees levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Chain Websites, and/or other reservation systems, distribution channels and networks, and fees for additional services and programs. We may charge Chain Facilities using the System outside the United States for reservation service using a different formula. We may change, modify, add or delete the System Assessment Fee and/or Additional Fees in accordance with Schedule C.

7.2 You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees and basic charges by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes to us when due.

7.3 "Interest" is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

7.4 If a transfer occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new franchisee for the Facility.

7.5 You will report and pay to us all Recurring Fees and other fees and charges on-line via our self-service Electronic Invoice Presentment and Payment tool ("WynPay") accessible through our Chain intranet. In the WynPay on-line environment, payments can be made either through the electronic check payment channel or the credit card payment channel. We reserve the right to change, from time to time, the technologies or other means for reporting and paying fees to us by amending the System Standards Manual.

11

## 8.  Indemnifications.

8.1 Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven. You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury. This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2 You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee. You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest. We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3 We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name. You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you. You will cooperate with our defense and resolution of the claim. We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9.  Your Assignments, Transfers and Conveyances.

9.1 **Transfer of the Facility.** This Agreement is personal to you (and your owners if you are an entity). We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you. You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent. If a Transfer is to occur, the transferee or you must comply with Section 9.3. Your Franchise is subject to termination when the Transfer occurs. The Franchise is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility

12

under the System, and you are responsible for performing the post-Termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2 **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $5,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3 **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a franchisee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new franchise applicant, pay the Application and Relicense Fees then in effect, sign the form of Franchise Agreement we then offer in conversion transactions and agree to renovate the Facility as we reasonably determine, if the Facility achieves a score of less than "Satisfactory" on its most recent Quality Assurance inspection. We will provide a Punch List of improvements we will require after we receive the transferee's Application. We may, in our discretion, require the transferee to place funds in escrow, at its expense, in order to complete all necessary renovations. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or, in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the Franchise when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your Owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4 **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the Franchise Agreement form then offered prospective franchisees. No transfer to a Permitted Transferee shall release a

13

living transferor from liability under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

**9.5 Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

**9.6 Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your Owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1    **Default.** In addition to the matters identified in Sections 3.1 and 3.6, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, if you have acted diligently to cure the default but cannot do so, and the default does not relate to health or safety, we may, in our discretion, enter into an improvement agreement with you provided you request such an agreement within 30 days after receiving notice of the failing inspection. If we have entered into an improvement agreement, you must cure the default within the time period specified in the improvement agreement which shall not exceed 90 days after the failed inspection. We may terminate this Agreement and any or all rights granted hereunder if you do not perform that improvement agreement.

14

11.2    **Termination.**  We may terminate this Agreement effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Schedule D due to your failure to perform your Improvement Obligation, (2) you discontinue operating the Facility as a Chain Facility, (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or franchise agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your Owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Owners contest in court the ownership or right to franchise all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3    **Casualty and Condemnation.**

11.3.1  You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available.  You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations.  You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty.  This restoration will be completed within 180 days after the Casualty.  You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first.  If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2  You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.3.3  The protected territory covenants in Section 2 will terminate when you give us notice of any proposed Condemnation or that you will not restore the Facility after a Casualty.

11.4    **Our Other Remedies.**  We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, including the failure to observe Technology Standards,

15

discontinue reservation referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All System Assessment Fees accrue during the suspension period. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Reconnection Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may deduct points under our quality assurance inspection program for your failure to comply with this Agreement or System Standards. We may omit the Facility from any paper or electronic directory of Chain Facilities that we issue. If you default under this Agreement because the Facility fails to meet System Standards, including without limitation failing a quality assurance inspection, we may, at our option and in our sole discretion, require as a condition to your cure of the default that you engage a hotel management company acceptable to us to operate the Facility for a period of at least two years, or longer in our discretion. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts past due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld while you are in default under this Agreement or may be conditioned on the cure of all your defaults. Once a termination or expiration date for this Agreement has been established in accordance with the provisions of this Agreement, we may cease accepting reservations through the Reservation System for any person(s) seeking to make a reservation for a stay on any date including or following the termination or expiration of this Agreement.

11.5    **Your Remedies.**  If we do not issue our approval or consent as and when required under this Agreement, within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action to compel us to issue our approval or consent shall be your exclusive remedy. We shall not be responsible to you for direct, indirect, special, consequential or exemplary damages, including but not limited to lost profits or revenues.

## 12. Liquidated Damages.

12.1    **Generally.**  If we terminate the Franchise under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us Liquidated Damages within 30 days following the date of Termination. If Termination occurs during the last two Franchise Years of the Term, Liquidated Damages will be the lesser of (i) the amount specified in Section 18.3, or (ii) the average daily fees based on a percentage of Gross Room Revenues accruing under Section 7.1 during the 12 full calendar months preceding the month in which Termination occurs multiplied by the number of days remaining in the unexpired Term (the "Ending Period") at the date of Termination. You will also pay any applicable Taxes assessed on such payment. Before the last two Franchise Years, Liquidated Damages will be **as set forth in Section 18.3**. If we terminate this Agreement before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount

16

payable after the Opening Date. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

**12.2    Condemnation Payments.**  In the event a Condemnation is to occur, you will pay us Royalties and System Assessment Fees for a period of one year (the "Notice Period") after we receive the initial notice of condemnation described in Section 11.3, or until the Condemnation occurs, whichever is longer.  You will pay us Liquidated Damages equal to the average daily Royalties and System Assessment Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the Notice Period if the Condemnation is completed before the Notice Period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority).  You will pay no Liquidated Damages if the Condemnation is completed after the Notice Period expires, but Recurring Fees must be paid when due until Condemnation is completed.

**13. Your Duties At and After Termination.**    When a Termination occurs for any reason whatsoever:

**13.1    System Usage Ceases.**    You must comply with the following "de-identification" obligations. You will immediately stop using the System to operate and identify the Facility. You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual or other brand directives for changing the identification of the Facility. You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces.  You will cease all Internet marketing using any Marks to identify the Facility.  If you do not strictly comply with all of the de-identification requirements above, in the System Standards Manual and in our other brand directives, you agree to pay us a royalty equal to $2,000 per day until de-identification is completed to our satisfaction.

**13.2    Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination.  We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4.  We may notify third parties that the Facility is no longer associated with the Chain.  We may also, to the extent permitted by applicable law, and without prior notice enter the Facility, and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours. If you have not completed your de-identification obligations to our satisfaction, we may paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination.  You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage. We will exercise reasonable care in removing or painting over signage. We will have no obligation or liability to restore the Facility to its condition prior to removing the signage. We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

17

13.3  **Advance Reservations.** The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4  **Survival of Certain Provisions.** Sections 3.6 (as to audits, for 2 years after termination), 3.11, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of this Agreement.

**14. Your Representations and Warranties.** The parties disclaim making or relying upon any representation, promise, covenant, or warranty, express or implied, oral or written, except as expressly stated in this Agreement. You expressly represent and warrant to us as follows:

14.1  **Quiet Enjoyment and Financing.** You own, or will own prior to commencing improvement, or lease, the Location and the Facility. You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility. You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

14.2  **This Transaction.** You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement. You have obtained all necessary approvals of your Owners, Board of Directors and lenders. No executory franchise, license or affiliation agreement for the Facility exists other than this Agreement. Schedule B accurately reflects your ownership. Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your Owners is a party or is subject or to which the Facility is subject. Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application. You will submit to us the documents about the Facility, you, your Owners and your finances that we request in the Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement. To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or are, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of Treasury's Office of Foreign Assets Control, or otherwise.

14.3  **No Misrepresentations or Implied Covenants.** All written information you submit to us about the Facility, you, your Owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

18

BAY CON
Q1/13

**15. Proprietary Rights.**

15.1    **Marks and System.**  You will not acquire any interest in or right to use the System or Marks except under this Agreement.  You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2    **Inurements.** All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  You acknowledge that System Standards include non-functional trade dress that is an integral part of the System and you covenant that you will not, directly or indirectly through an affiliate, use the trade dress in any structure that is not a Chain Facility. No good will shall attach to any secondary designator that you use.

15.3    **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as franchisor or franchisee), provide services to or joint venture (i) distinctive separate lodging, or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory.  You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks. We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4    **Confidential Information.**    You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.  You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.  Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

19

15.5   **Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) or any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone handle disputes with third parties concerning use of all or any part of the System. You will cooperate with our efforts to resolve these disputes.  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

15.6   **The Internet and other Distribution Channels.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark except as otherwise expressly permitted by the System Standards Manual or with our written consent.  You will assign to us any such identification at our request without compensation or consideration. You may not purchase any key words for paid search or other electronic marketing that utilizes any Mark without our written consent. You must make available through the Reservation System and the Chain Website all rates you offer directly to the general public or indirectly via Internet marketing arrangements with third parties.  You agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to intermediaries and retailers on your behalf or for Chain Facilities to participate in their programs.  You must *participate in the Chain's best available rate on the Internet guarantee or successor program. The* content you provide us or use yourself for any Internet or distribution marketing materials must be true, correct and accurate, and you will notify us in writing promptly when any correction to *the content becomes necessary.  You shall promptly modify at our request the content of any* Internet or distribution marketing materials for the Facility you use, authorize, display or provide to conform to System Standards.  Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16. Relationship of Parties.

16.1   **Independence.**  You are an independent contractor.  You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever.  We and you have a business relationship based entirely on and circumscribed by this Agreement.  No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.  You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

16.2   **Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly. The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17. Legal Matters.

20

BAY CON
Q1/13

17.1   **Partial Invalidity.** If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect. If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected. However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

17.2   **Waivers, Modifications and Approvals.** If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice. Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel. All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective. We may unilaterally revise Schedule C when this Agreement so permits.

17.3   **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, (iii) by first class, prepaid certified or registered mail, return receipt requested, (iv) by electronic mail, posting of the notice on our Chain intranet site or by a similar technology; or (v) by such other means as to result in actual or constructive receipt by the person or office holder designated below, to the appropriate party at its address stated below or as it may otherwise designated by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

BAYMONT FRANCHISE SYSTEMS, INC.:
Our address: 22 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Senior Vice President-Contracts Administration;
Fax No. (973) 753-8311

Your name: **ZRII, LLC,**
Your address: **64 Brookside Drive, Holland, PA 17325,**
Attention: **Nilesh Patel;**
Your fax No.: **215-355-4343;**
Your e-mail address: **NNP61@yahoo.com.**

17.4   **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5   **Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The *section headings in this Agreement are for convenience of reference only.*

17.6   **Choice of Law; Venue; Dispute Resolution.**

21

BAY CON
Q1/13

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will *not apply to any Facility located outside the State of New Jersey.*

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or *the parties' relationship promptly through negotiation between authorized representatives. If these* efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

**17.6.4 WAIVER OF JURY TRIAL. THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE FRANCHISOR, THE FRANCHISEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

17.6.5 Any judicial proceeding directly or indirectly arising from or relating to this Agreement shall be considered unique as to its facts and may not be brought as a class action. You and each of the owners of your Equity Interests waive any right to proceed against us by way of class action.

**17.7    Special Acknowledgments. You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1 You received our Franchise Disclosure Document ("FDD") for prospective franchisees at least 14 days before signing this Agreement or paying any fee to us.**

**17.7.2 Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement or in the FDD. You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement or in the FDD.**

**17.7.3 This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the Franchise other than those set forth in the FDD.**

**17.7.4 You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the**

22

**Facility except as stated in Item 19 of the FDD or in a writing that is attached to this Agreement.**

**17.7.5 You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17.8    **Force Majeure.** Neither you nor we shall be liable for loss or damage or deemed to be in breach of this Agreement if the failure to perform obligations results from: (a) windstorms, rains, floods, earthquakes, typhoons, mudslides or other similar natural causes; (b) fires, strikes, embargoes, war, acts of terrorism or riot; (c) legal restrictions that prohibit or prevent performance; *or (d) any other similar event or cause beyond the control of the party affected. Any delay resulting from any of such causes shall extend performance accordingly or excuse performance, in whole or in part, as may be reasonable, so long as a remedy is continuously and diligently sought by the affected party, except that no such cause shall excuse payment of amounts owed at the time of such* occurrence or payment of Recurring Fees and other amounts due to us subsequent to such occurrence other than a governmental or judicial order prohibiting such payments.

18.    **Special Stipulations.** The following special stipulations apply to this Agreement and supersede any inconsistent or conflicting provisions. You acknowledge that these stipulations and any changes made to the body of the Agreement at your request or in response to other changes to our form agreement are the product of arms' length negotiations with us and represent mutually agreed, material inducements to enter into this Agreement, beneficial to you and are supported by adequate consideration from both parties. These are personal to you and are not transferable or assignable except to a Permitted Transferee.

18.1    **Your Additional Termination Right.** You may terminate this Agreement without cause or penalty effective only on the **fifth or tenth or fifteenth** anniversary of the Opening Date provided you give us at least six (6) months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores less than 85% (or its then equivalent) on a quality assurance inspection *and then fails to achieve a score more than 85% (or its then equivalent)* in a reinspection to be performed no sooner than 90 days after the initial inspection. You will not exercise this right if the Facility is then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless you first obtain SBA's consent.

18.2    **Our Additional Termination Right.** We may terminate this Agreement without cause or penalty effective only on the **fifth or tenth or fifteenth** anniversary of the Opening Date provided we give you at least six (6) months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. We will not exercise this right if you notify us that the Facility is

23

then financed under a program in which the United States Small Business Administration ("SBA") guarantees the financing or its repayment unless we first obtain SBA's consent.

18.3 **Liquidated Damages.** Liquidated Damages payable under Section 12.1 for a Termination that occurs before the last two Franchise Years will be Eight Hundred Fifty Dollars ($850.00) for each guest room of the Facility you are authorized to operate at the time of Termination.

18.4 **Royalty Credit.** We will grant you a credit in the amount of $20,000.00 to be applied against Recurring Fees payable to us under Section 18.5 and Section 7, accruing on or after **the opening date.** The credit shall be applied to the first monthly payment of Recurring Fees due after the credit commences and shall continue to be applied on a monthly basis until fully utilized. The credit shall not apply to additional charges such as GDS Fees, Internet Booking Fees, travel agent commissions, Loyalty Program Charges, or guest satisfaction program payments

18.5. **Combined Fees.** Notwithstanding Section 7.1, **provided that the Facility opens by the deadline specified in Section 3.1 of this Agreement,** you will pay a Combined Fee consisting of the Royalty and System Assessment Fee (which is comprised of a Marketing Contribution and Basic Reservation Fee) at the rates set forth in this Section. The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement. The discount from the Royalty and System Assessment Fees set forth in Section 7 that the Combined Fee represents (the "Discount Amount") shall first be applied to the Basic Reservation Fee and any remaining Discount Amount shall be applied evenly between the Royalty and Marketing Contribution.

18.5.1 The Combined Fee shall be five and one half percent (5.5%) of Gross Room Revenues accruing during the first and second Franchise Year; and

18.5.2 The Combined Fee shall be six and one half percent (6.5%) of Gross Room Revenues accruing during the third Franchise Year; and

18.5.3 The Combined Fee shall be seven and one half percent (7.5%) of Gross Room Revenues accruing during the fourth Franchise Year; and

18.5.4 The Royalty and System Assessment Fees shall be computed and paid at the rates specified in Section 7.1 on Gross Room Revenues accruing after the fourth Franchise Year.

18.5.5 The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty and System Assessment Fees shall reset to the rates

24

specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of less than 85% (or its then equivalent) and the Facility fails to achieve a quality assurance inspection score of more than 85% in a re-inspection to be performed not less than 60 days after the initial inspection.

18.6 **Prior Affiliation**. Notwithstanding anything to the contrary, you agree that, prior to the Opening Date, you will provide us with a copy of the written termination notice or other written evidence satisfactory to us in our sole discretion that any prior hotel affiliation has terminated before we will cause the Opening Date to occur. We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if you do not provide satisfactory proof of termination of the prior hotel affiliation prior to the Opening Date.

remainder of page intentionally left blank

24A

IN WITNESS WHEREOF, the parties have executed this Agreement on this $3$ day of _____Dec._____, 20\13, and agree to be bound by the terms and conditions of this Agreement as of the Effective Date stated above.

**WE:**
**BAYMONT FRANCHISE SYSTEMS, INC.**


By: _____
        Senior Vice President
        Contracts Administration, Compliance and Quality Assurance


**YOU, as franchisee:**
**ZRII, LLC**


By: _____
        **(Managing) Member**

Dated:   November 20, 2013

25

# APPENDIX A

## DEFINITIONS

<u>ADA</u> means the Americans with Disabilities Act, as amended, 42 U.S.C. 12101 <u>et</u> seq., and the related Federal regulations, as amended, including the Accessibility Guidelines and Standards for Accessible Design, 28 C.F.R. Part 36, Appendix A.

<u>Additional Fees</u> means the fees charged under Section 7.1.2 other than the System Assessment Fee.

<u>Agreement</u> means this Franchise Agreement.

<u>Application Fee</u> *means the fee you pay when you submit your Application under Part 6.*

<u>Approved Plans</u> means your plans and specifications for constructing or improving the Facility *initially or after opening, as approved by us under Schedule D.*

<u>Approved Supplier</u> means a vendor authorized by us to provide proprietary or Mark-bearing items, *or whose goods and services are deemed to meet applicable System Standards.*

<u>Casualty</u> means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

<u>Chain</u> means the network of Chain Facilities.

<u>Chain Facility</u> means a transient lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

<u>Chain Websites</u> means any current or future consumer or business websites, mobile websites or mobile applications that we or our affiliates develop for booking reservations for and/or providing information about Chain Facilities, and any future equivalent technology.

<u>Condemnation</u> means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

<u>Conference Fee</u> means the fee we charge for your attendance at a conference for Chain Facilities and their franchisees when and if held.

<u>Confidential Information</u> means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence.    Confidential Information includes all other system standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the property management system software and other applications software.

Appendix A - 26

BAY CON
Q1/13

<u>Design Standards</u> mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

<u>Directory</u> means any general purpose directory we issue, whether printed, web-based, or issued in another medium, which may list the names and addresses of Chain Facilities in the United States, and at our discretion, other System facilities located outside the United States, Canada and Mexico.

<u>Effective Date</u> is the date we insert in the Preamble of this Agreement after we sign it.

<u>Equity Interests</u> shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

<u>Equity Transfer</u> means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those Owners disclosed on *Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights*, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. *An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner.* An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does <u>not</u> occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

<u>Facility</u> means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties existing or to be constructed at the Location on or after the Effective Date.

<u>FF&E</u> means furniture, fixtures and equipment.

<u>FF&E Standards</u> means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

<u>Food and Beverage</u> means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Appendix A - 27

HAY CON
Q1/13

<u>Franchise</u> means the non-exclusive franchise to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

<u>Franchise Year means</u>:

    (i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

    (ii) *If the Opening Date does not occur on the first day of a month*: the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

<u>Gross Room Revenues</u> means gross receipts attributable to or payable for rentals of guest (sleeping) rooms at the Facility, including all credit transactions, whether or not collected, guaranteed no-show revenue net of chargebacks from credit card issuers, and any proceeds from any business interruption or similar insurance applicable to the loss of revenues due to the non-availability of guest rooms. Excluded from Gross Room Revenues are **separate** charges to guests for Food and Beverage, room service, actual telephone charges, key forfeitures and entertainment (including Internet fees and commissions); vending machine receipts; and federal, state and local sales, occupancy and use taxes.

<u>Improvement Obligation</u> means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Schedule D.

<u>Indemnitees</u> means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

<u>Initial Fee</u> means the fee you are to pay for signing this Agreement as stated in Section 6, if the *Agreement is for a new construction or conversion franchise.*

<u>Liquidated Damages</u> means the amounts payable under Section 12, set by the parties because actual *damages will be difficult or impossible to ascertain on the Effective Date and the amount is a* reasonable pre-estimate of the damages that will be incurred and is not a penalty.

<u>Location</u> means the parcel of land situated at **871 York Road, Gettysburg, PA 17325**, as more fully described in Schedule A.

<u>Losses and Expenses</u> means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnities, including guest refunds, or (ii) incurred by any and all Indemnities to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

Appendix A - 28

<u>Loyalty Program Charge</u> means the fee you pay us under Section 7.1.3 and Schedule C for a frequent guest rewards program or other special marketing programs that we may create or undertake and require participation by Chain Facilities.

<u>Maintenance Standards</u> means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

<u>Marks</u> means, collectively (i) the service marks associated with the System published in the System *Standards Manual from time to time including, but not limited to, the names, designs and logos for* "BAYMONT" U.S. Reg No. 2,258,085; "BAYMONT INN", U.S. Reg. No.2,286,567; BAYMONT INN & Design, U.S. Reg. Nos. 2,307,473; 2,354,792; 2,383,033; "BAYMONT INN & SUITES" U.S. Reg. No. 2,713,336; BAYMONT INN & SUITES & Design, U.S. Reg. Nos. 2,399,770; 2,354,791; 2,309,146; and other marks; and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

<u>Marketing Fees</u> means the System Assessment Fee and the Additional Fees charged under Section 7.1.2 and Schedule C, and the Loyalty Program Charge, if any.

<u>Marks Standards</u> means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

<u>Material Renovation</u> means the upgrading, updating, modifications, replacements, additions, repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.14.

<u>Material Renovation Notice</u> means the written notice from us to you specifying the Material Renovation to be performed and the dates for commencement and completion given under Section 3.14.

<u>Opening Date</u> has the meaning specified in Schedule D.

<u>Operations Standards</u> *means standards specified in the System Standards Manual for cleanliness,* housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

<u>Owners</u> means the persons identified on Schedule B as the owners of your Equity Interests.

<u>Permitted Transferee</u> means (i) any entity, natural person(s) or trust receiving from the personal representative of an Owner any or all of the Owner's Equity Interests upon the death of the Owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Appendix A - 29

Protected Territory means **all the area within a circle created by a five (5) mile radius whose centerpoint is the front door of the Facility**.

Prototype Plans has the meaning specified in Schedule D for New Construction Facilities.

Punch List means any list of upgrades and improvements attached as part of Schedule D, which you are required to complete under Section 3.1 and Schedule D.

Reconnection Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement or for any other reason, in the amount specified in Schedule C.

Recurring Fees means the Royalties and Marketing Fees as stated in Section 7.

Relicense Fee means the fee your transferee pays to us when a Transfer occurs or the fee you pay to us if you are renewing an existing franchise.

Reinspection Fee means the fee you must pay to us under Section 3.7 if you do not complete your Punch List on time, fail any inspection or do not cooperate with our inspector or inspection System Standards.

Reservation System or "Central Reservation System" means back end technology platform and applications used by us to accept, store and/or communicate reservations for Chain Facilities. The Reservation System is separate from, but enables, the booking of reservations for Chain Facilities through various distribution channels such as the Chain Websites, the GDS and other distribution channels.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify, which at present includes only the following: (a) the Marks; (b) other intellectual property, including Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Assessment Fees means the fees charged under Section 7.1.2 and Schedule C for the Chain's marketing, advertising, public relations, Reservation System, training and other services.

System Standards means the standards for participating in the Chain and using the System published in the System Standards Manual, or elsewhere, including but not limited to design standards, FF&E Standards, Marks standards, marketing standards, operations standards, technology standards and maintenance standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

BAY CON
Q1/13

System Standards Manual means the Standards of Operation Manual and any other manual or written directive or other communication we issue or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, Internet access, in-room and public area technology, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

Termination means a termination of this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as franchisee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Baymont Franchise Systems, Inc., a Delaware corporation, its successors and assigns.

## SCHEDULE A

(Legal Description of Facility)

BAY CON
Q1/13

EXHIBIT "A"

ALL THAT CERTAIN tract of land Situate in Straban Township, Adams County, Pennsylvania, consisting of Lots 6 and 7 depicted in Adams County Plat Book 46, page 23, bounded and described according to a Land Title Survey for Hasu P. Shah, Comfort Inn Hotel, made by Sharrah Design Group, Inc., Gettysburg, PA dated 10/28/2008, as follows, to wit:

BEGINNING at a point in or near the centerline of York Road (State Route 30), which point is in the most Northeasterly corner of the tract about to be described, which point is also the Northwesternmost corner of a 60 feet wide private Village Green Drive, the following five (5) courses and distances: (1) south 34 degrees 00 minutes 00 seconds East 202.33 feet to a magnetic nail set in the entrance drive to lands now or formerly of Gettysburg Investment Company, L. P.; (2) along the arc of a curve to the left having a radius of 259.84 feet, arc length of 152.39 feet, chord bearing of South 50 degrees 49 minutes 10 seconds East and a chord distance of 150.22 feet to a 5/8 inch rebar set; (3) South 67 degrees 36 minutes 10 seconds East 219.56 feet to a 5/8 inch rebar set; (4) along the arc of a curve to the right having a radius of 150.00 feet, arc length of 87.98 feet, chord bearing of South 50 degrees 48 minutes 05 seconds East and a chord distance of 86.72 feet to a 5/8 inch rebar set and (5) South 34 degrees 00 minutes 00 seconds East 290.00 feet to a 5/8 inch rebar found on line of lands now or formerly of mark Gettysburg Associates, L. P.; thence by said Mark Gettysburg Associates, L. P. land South 56 degrees 00 minutes 25 seconds West 200.04 feet to a concrete monument found; thence partly by same and partly by lands now or formerly of Gettysburg Investment Company, L. P. North 33 degrees 59 minutes 55 seconds West, passing through a steel rod with an aluminum cap found 459.04 feet from the beginning of this course (which steel rod is the property corner separating Mark Gettysburg Associates, L. P. lands from Gettysburg Investment Company, L. P. lands) continuing an additional 412.47 feet from said steel rod with an aluminum cap, to a drill hole found in the concrete curb, which drill hole is 30.49 feet from the end of this course, for a total course distance of 902.00 feet to a point in or near the centerline of aforementioned York Road; thence in or along the centerline of York Road North 56 degrees 00 minutes 00 seconds East 10.02 feet to the place of beginning.

TOGETHER with the right to use the private road, utility and storm water easements, easements and rights of way for their proper purposes, including pedestrian and vehicular access, ingress, egress and regress, in common with the owners, tenants and occupiers abutting same and theirs successors and assigns, forever, as more particularly set forth in Deed Book 523 page 55.

Tax ID / Parcel No.  38-G12-145 & 147

Being, as to Premises A and B, part of the same premises which Gettysburg Area Industrial Development Authority (GAIDA) by Deed dated 5/22/1989 and recorded 5/24/1989 in Adams  County in Record Book 523 Page 55 conveyed unto 144 Associates, a Pennsylvania partnership, in fee.

Being, as to Premises A, the same premises which 144 Associates, a Pennsylvania partnership by Deed dated 10/7/1989 and recorded 10/10/1989 in Adams  County in Record Book 536 Page 1 conveyed unto Hasu P. Shah, in fee. ($1.00 Consideration)

EXHIBIT "A" (continued)

Being, as to Premises B, the same premises which 144 Associates, a Pennsylvania partnership by Deed dated 5/8/1992 and recorded 5/29/1992 in Adams County in Record Book 628 Page 860 conveyed unto Hasu P. Shah, in fee.

## SCHEDULE B

*PART I: YOUR OWNERS*

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|---|---|---|---|
| **Nilesh Patel** | **100%** | **Member** | |

*PART II: THE BAYMONT FACILITY:*

Number of approved guest rooms: **80**

[Number of approved suites:            ]

Dated:  November 20, 2013

_____
Initial

Schedule B - 33

**BAYMONT FRANCHISE SYSTEMS, INC.**
**SCHEDULE C**
**April 2013**

**I      System Assessment Fees**

The System Assessment Fees consist of the "Marketing Contribution" and the "Basic Reservation Fee." The Marketing Contribution is 2.0% of Gross Room Revenues; the Basic Reservation Fee is 1.5% of Gross Room Revenues. We reserve the right, in our sole discretion, to increase or modify the System Assessment Fees for all Chain Facilities from time to time to cover costs (including reasonable direct or indirect overhead costs) related to the services and programs referenced in 7.1.2 but only after consultation with the official advisory board or committee, if any, and upon 30 days prior written notice.

**II     Additional Fees**

**A.     Loyalty Program Charge**

We charge a Loyalty Program Charge for your participation in the Wyndham Rewards or successor guest loyalty program. The Loyalty Program Charge is up to 5% of the Gross Room Revenues accruing from each "Qualifying Stay" at the Facility as defined in the Front Desk Guide or any other program rules, which are System Standards. We will proactively match and award members with points or other program currency they earn on Qualifying Stays even if they do not present their Wyndham Rewards membership card upon check-in. You will be billed monthly in arrears for points or other program currency awarded to members during the preceding month.

**B.     Customer Care Fee**

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. We may also contact you, at our discretion, if we become aware of any other complaints about the Facility including complaints which are posted on third-party travel websites, distribution channels, blogs and social networks, or other forums to which you do not respond. If you do not respond to resolve any complaint to the satisfaction of the guest within three business days after we refer it to you, we will charge you a "Customer Care Fee" of $195.00, plus the costs we incur to settle the matter with the guest. The Customer Care Fee is intended only to reimburse us for the costs of complaint handling and is not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

**C.     Best Available Rate Program**

You must (i) make available through the Central Reservation System and the Chain Websites room rates equivalent to those you offer to the general public directly or indirectly via third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements. If a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through any of the Chain Websites or the Central Reservation

Schedule C - 34

BAY CON
Q1/13

System for the same date and accommodations and the guest meets all Program requirements, you must provide the applicable night(s) to the guest at 10% less than the lower rate offered on the Internet. You may collect standard incidental fees, charges and taxes. We will also charge you a Processing Fee of $60.00 to reimburse us for our administrative charges of handling the complaint.

D.     **Reconnection Fee**

If we suspend Central Reservation System service because of your default under this Agreement or for any other reason, then you must pay us the Reconnection Fee set forth in the System Standards before we restore service. Currently, the Reconnection Fee is $4,000.

E.     **GDS, Direct Connect and other Distribution Channel Fees**

We will charge you either a GDS Fee, Direct Connect Fee or Distribution Channel Fee, as applicable, for qualified reservations for your Facility processed (i) through the global distribution systems ("GDS"), (ii) made through direct connections with on-line travel agencies and partners or (iii) through another distribution channel, including an on-line travel agency or our Chain Websites. GDS Fees are assessed for reservations processed through any GDS or through any Internet website or other booking source powered by a GDS. Direct Connect Fees are assessed for qualified reservations made with on-line travel agencies and partners with which we have or establish a direct connection. Distribution Channel Fees are assessed for qualified reservations originated through all other on-line distribution channels. If a guest cancels a GDS originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable GDS Fee. This does not apply to reservations originated and canceled through direct connections or other distribution channels. GDS, Direct Connect and Distribution Channel originated reservations may also incur agent and similar commissions. We will establish the amount of the GDS, Direct Connect and Distribution Channel Fees from time to time based on a weighted average of the fees these channels charge us and/or our own costs (including overhead) for providing these services. Distribution Channel Fees may vary by distribution channel.

F.     **Commissions and Other Charges**

You must pay and/or reimburse us up to 20% of the Gross Room Revenues from the following qualified reservation booked by "Agents" or other qualifying originators, plus our service charge of up to 1.5% of commissionable revenue. "Agents" include, but are not limited to, travel agents, on-line travel and referral websites, travel consortia, travel management companies, global sales agents and other third party distribution channels. These payments may be allocated to commissions charged by the Agents or to paid search and/or other marketing activities conducted or to be conducted by or through these Agents on a going forward basis.

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from qualified reservations consumed by members of affinity groups and organizations participating in our Member Benefits Program, plus our service charge of up to 1.5% of commissionable revenue. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits Program to its members and distributes the remaining portion to our Global Sales

Schedule C - 35

Organization to offset its administrative and overhead costs for supporting the Member Benefits Program and other programs for generating room nights at Chain Facilities.

Under our G.O. Leads Plus Referral Program, our Global Sales Organization *refers* leads for reservations from groups, government, business travelers, specialty markets, travel management companies and consortia, and other sources to Chain Facilities. One source of *reservations are leads from other Chain Facilities.* For this business, *we* or an affiliate charges you a sales commission of 10% of the Gross Room Revenues on qualifying reservations. We or our affiliate pays 7% of the sales commission to the referring Chain Facility and distributes the *remainder to our Global Sales Organization to offset its administrative and overhead costs for* supporting the G.O. Leads Plus Referral Program and other programs for generating room nights at Chain Facilities.

G.    **MyRequest**

*We will charge you a fee for providing telephone support and assistance in connection* with such services which is otherwise available to you through the MyRequest Portal (e.g., rate, inventory and content management requests in our central reservation system). Currently, this *fee is $20.00 per telephone call.*

We may change, modify or delete Additional Fees for existing services and programs and add new Additional Fees for new services, programs and distribution channels at any time upon not less than thirty (30) days' written notice.

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

This Addendum applies if you are converting an existing guest lodging facility to a Baymont Facility.

## 1.  YOUR IMPROVEMENT OBLIGATION.

1.1 **Improvements.**  You must select and acquire the Location and acquire, equip and supply the Facility in accordance with Schedule B and System Standards.  You must provide us with proof that you own or lease the Facility before or within 30 days after the Effective Date.  You must begin renovation of the Facility no later than 60 days after the Effective Date.  The deadline for completing the pre-opening phase of conversion and the renovations specified on any Punch List attached to this Agreement **the later to occur of (i) 120 days after the Effective Date, or (ii) the date you cease operation as part of another hotel chain.  You must provide us with a copy of the written termination notice or other written evidence satisfactory to us in our sole discretion that any prior hotel affiliation has terminated.**.  All renovations will comply with System Standards, any Approved Plans, Schedule B and the Punch List.  Your general contractor or you must carry the insurance required under this Agreement during renovation. You must complete the opening renovation specified on the Punch List before we consider the Facility to be ready to open under the System.  You must continue renovation and improvement of the Facility after the Opening Date if the Punch List so requires.  We may, in our discretion, require you to place funds in escrow, at your expense, in order to complete all necessary renovations.  We may, in our sole discretion, terminate this Agreement by giving written notice to you (subject to applicable law) if (1) you do not commence or complete the opening improvements of the Facility by the dates specified in this Section, or (2) you prematurely identify the Facility as a Chain Facility or begin operation under the System name described in Schedule B in violation of Section 3.1 and you fail to either complete the pre-opening Improvement Obligation or cease operating and/or identifying the Facility under the Marks and System within five days after we send you written notice of default.  Time is of the essence for the Improvement Obligation.  We may, however, in our sole discretion, grant one or more extensions of time to perform any phase of the Improvement Obligation.  You will pay us a non-refundable extension fee of $2.00 per room per day of any extension of the deadline for completing pre-opening improvements.  This fee will be payable to us after each 30 days of the extension.  You will pay us the balance of the extension fee outstanding when the Facility opens under the System 10 days after the Opening Date.  You must also pay us the Reinspection Fee described in Section 3.7 if you fail to complete any Improvement Obligation by the deadline established in the Punch List and our representatives must return to the Facility to inspect it.  We may grant you an extension of time to complete the items on your Punch List in our sole discretion.  The grant of an extension will not waive any other default existing at the time the extension is granted.

1.2 **Improvement Plans.**  You will create plans and specifications for the work described in Section 1.1 of this Schedule D (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.    Our  review  does  not  cover  technical,  architectural  or

Schedule D - 37

engineering factors, or compliance with federal, state or local laws, regulations or code requirements. We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction. Any material variation from the Approved Plans requires our prior written approval. We may offer to provide you or your architect with interior design or other prototypes. If you decline to utilize such prototype(s) in developing the Facility, we may charge you a fee for reviewing your custom plans and designs. We may offer other optional architectural and design services for a separate fee. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

1.3 **Pre-Opening.** You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first obtaining our approval under and as permitted under and strictly in accordance with the System Standards Manual. If you identify the Facility as a Chain Facility or operate the Facility under a Mark before the Opening Date without our express written consent, then in addition to our remedies under Sections 3.1 and 11.2, you will begin paying the Royalty to us, as specified in Section 7.1, from the date you identify or operate the Facility using the Mark. We may delay the Opening Date until you pay the Royalty accruing under this Section.

1.4 **Integration Services.** We will provide the following "Integration Services" to assist you in opening the Facility. We will provide training through various on-line courses on subjects such as quality assurance, Wyndham Hotel Group Resources, housekeeping, preventative maintenance, customer service, and the RFP process. A member of our field team will also visit the Facility to provide on-site training in various operational issues including, but not limited to, the System Standards, using the Chain's intranet site, and revenue management principles. We will deliver to you an initial supply, as determined by us in our reasonable discretion, of certain Mark-bearing guest room products. We will arrange to have digital photographs taken of the Facility in accordance with System Standards which will be suitable for posting on our Chain Websites and third party travel websites and will be owned by us. If we allow you to open the Facility before your installation of permanent signage, we will arrange for one of our approved suppliers to provide temporary exterior signage for the Facility in the form of a Mark-bearing bag to cover your primary free standing sign. If you install permanent signage from an approved supplier for the Facility on or before the Opening Date, or if within thirty (30) days of the Opening Date, you sign a quote and pay the required deposit for permanent signage from the vendor assigned to provide temporary signage for the Facility, we shall issue you a credit of $1,000 against the Integration Services Fee. We will provide orientation training for your general manager as set forth in Section 4.1 of the Agreement if he/she attends the training by the deadline set forth in Section 4.1.

1.5 **Integration Services Fee.** You will pay a non-refundable "Integration Services Fee" of **$4,900.00** on or before the Opening Date.

## 2. DEFINITIONS.

<u>Opening Date</u> means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Schedule D - 38

## SCHEDULE D
## ADDENDUM FOR CONVERSION FACILITIES

**[Punch List Attached]**

BAY CON
Q1/13



# BAYMONT®
## INN & SUITES

## Baymont Franchise Systems, Inc.
## PROPERTY IMPROVEMENT PLAN REPORT

## Comfort Inn
## Gettysburg, PA

## Conversion To
## Baymont Inn & Suites

### May 13, 2013
#### Revised November 6, 2013

O-43

**PLAN REQUIREMENTS & SUBMITTAL PROCESS**

Please submit all design plans and specifications to the Global Design Department (interior.design@wyn.com) for review and approval prior to purchasing or starting renovations. All renovations must meet Brand Standards, any items purchased or renovated without approval may need replacement if they do not meet brand design standards.

**OVERVIEW**

The PIP identifies specific items which we inspected at the Facility which were not in compliance with brand standards and need to be corrected. It is the responsibility of the Owner/Franchisee to review the Brand Standards Manual for a complete description of all standards and to maintain Brand Standards for any areas of the property that are not specifically covered in this PIP. In addition, you are responsible for ensuring that the Facility is constructed, improved, maintained and operated in compliance with all applicable federal, state and local laws, codes, ordinances and regulations, including but not limited to, the Americans with Disabilities Act and its Accessibility Guidelines. This PIP was based on a random sample inspection of the Facility on the date specified. You may need to take additional actions to meet brand standards or comply with law or, at our discretion, if the condition of the Facility changes materially since the inspection date or if the brand standards change.

All items in this PIP are required to be completed no later than the timeframes noted. Time extensions in no way imply a waiver. Failure to comply with specified deadlines for completing items may result in default under your license or franchise agreement and reservation service suspension. All items will continue to be evaluated on condition, appearance and adherence to brand standards through periodic quality assurance inspections. Any items on a future quality assurance inspection that do not meet brand standards will be required to be remedied. Failure to maintain acceptable levels of condition and appearance and adherence to brand standards may be grounds for default under the Franchise or License Agreement.

The Brand Standards reference provided within this PIP is to help guide you in finding the details of the standards you are required to comply with as part of this PIP. The reference provided is in no way complete instructions on the work required to fulfill the PIP requirements. Prior to the commencement of all work you are required to ensure you are complying with the most current standards. Please consult your Development Director or noted department with specific questions to comply with the requirements contained in the PIP. To obtain access to the Brand Standards please visit https://whgstandards.iraqa.com/ and submit an account application. Your request will be reviewed and processed in a timely manner.

By signing this PIP, I acknowledge and agree that select pieces of this PIP may be provided to our approved vendors for the purpose of their offering you products and services that are required to complete this PIP. Only information necessary for the vendor to offer their products and services will be provided, including contact information, property address, number of rooms, brand converting to, and a list of items related to necessary or required products and services.

ONLY THE FRANCHISOR MAY REVISE THIS PIP. THE PIP IS VOID 180 DAYS AFTER THE INSPECTION DATE UNLESS THE FRANCHISE OR LICENSE AGREEMENT BECOMES EFFECTIVE.

The Franchise Review Committee may in its discretion revise this PIP as a condition of approving your application. You should not consider this PIP to be final until we sign the License or Franchise Agreement.

Signed: _____    Date: 11/26/13

Print Name: Nilesh Pandy

Revisions- All Previous Copies are Invalid
6/20/13 PB/SW/DE  11/8/H3 sg/PB

File Name: PA Gettysburg Comfort Inn CV BAY        Page 2 of 7        Initial

| OWNER APPLICANT | |
|---|---|
| Property Name: | Comfort Inn |
| Property Address: | 871 York Road |
| City: | Gettysburg |
| St: | PA |
| Zip: | 17325 |
| Country/Region: | United States |
| Brand | Baymont |
| Tier | Inn & Suites |
| Opportunity Name: | BAY Gettysburg PA 8D |
| Account Name: | Gettysburg Comfort |
| Owner/Applicant | Nokesh Patel |
| Owner Phone: | 215-518-3131 |
| Development Director: | Scott Wolfe |
| Phone: | 973-222-5558 |
| Nearest City & State | York, Pennsylvania |

| INSPECTION INFORMATION | |
|---|---|
| Conversion Consultant: | Robert Boston |
| Number of Buildings Punched: | 1 |
| Number of Rooms Inspected: | 10 |
| Rooms Inspected: | 230, 231,223, 222, 216, 106, 105, 120, 130, 129 |
| PIP Reviewed By: | Stephen Greco |

| PROPERTY INFORMATION | |
|---|---|
| Age of Property: | Approximately 25 years |
| Total Number of Floors: | 2 |
| Single/Double Loaded: | Double |
| Exterior/Interior Corridor: | Interior |
| Construction: | Concrete block with brick and synthetic stucco facades |
| Competition: | Hampton Inn; Days Inn; Super 8 |
| Clientele: | 80% Leisure; 10% Commercial; 10% Transient |
| Total Licensed Guestrooms: | 80 |
| Total Meeting Rooms | 1 |
| Total Restaurants | 0 |
| Total Lounges | 0 |

**BRAND STANDARD VARIANCES**

The existing mounting clips on full-length mirrors in guestrooms are acceptable until mirrors grade a "Major" on any future Quality Assurance Evaluation. Upon replacement, framed full-length mirrors per Brand Standards are required.

The existing wall covering in the guest laundry will be acceptable until condition grades a "Major" on any future Quality Assurance Evaluation. Upon replacement, the installation of an approved wall option per Brand Standards are required.

---

The non-conforming items on the punchlist are separated by area of work (exterior, public areas, food and beverage, and guestrooms) and fall into three categories:

1) **CTO (Critical to open Brand standards)** - These brand standards are key in affiliating yourself with the brand and are critical to open your facility. Each of the items listed must be completed prior to opening your facility unless otherwise noted.

2) **ST (Brand standards)** - These standards are required to affiliate yourself with the brand. All items noted with an ST must be completed within the required timeframe.

3) **COND (Condition)** - These items reviewed did not meet brand quality standards. These items have a negative impact to the guest experience and must be corrected within the noted timeframes and comply with current brand standards. We recommend all franchisees implement and adhere to an ongoing self inspection and preventative maintenance program.

---

| Area of work | Item/ Location of Work | Category of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|---|
| General | Signage | Exterior and Interior Signage | CTO | Provide approved exterior and interior signage per Brand graphic standard specifications. For exterior signage a fully executed prepaid contract with an approved sign vendor must be provided prior to commencement. Please contact a property openings manager at 800-343-7639 for approved sign vendor information. Existing signage that is logo'd, or has a style or color that is associated with another brand or incompatible with current Brand Standards, or if signs are missing from required places must be replaced or installed. | 2 Months after opening | 200.01.01 / 200.01.02 / 200.01.03 / 200.01.04 / 200.01.05 / 200.01.06 / 200.01.07 / 400.02.05 / 700.02.03 |
| Exterior | Exterior Signage | Signage | COND | Repair/paint primary sign stanchion. | 3 Months after opening | 100.02.10 / 200.01.01 |
| Exterior | Building Exterior | Maintenance | COND | Pressure wash brick façade where stained. If stains remain, refinishing/painting brick will be required. Ensure a consistent appearance throughout. | Prior to July 1, 2014 | 200.03.05 / 100.02.03 |
| Exterior | Building Exterior | Exterior - Finishes | COND | Paint building exteriors (synthetic stucco façade, fascia, porte cochere and pipes on backside) where discolored, stained and/or rusty to provide a consistent appearance. | Prior to July 1, 2014 | 200.03.01 |
| Exterior | Building Exterior | Exterior - Finishes | COND | Replace/install metal fascia band where missing at front of building. | Prior to June 1, 2014 | 100.02.10 / 200.03.01 |
| Exterior | Building Exterior | Exterior - Finishes | COND | Refinish/replace PTAC louvers where faded and/or discolored. Ensure a consistent appearance throughout. | Prior to July 1, 2014 | 200.03.04 |
| Exterior | Building - Windows | FF&E | COND | Replace windows to include pool section where seals are broken (fogged appearance). | 6 Months after opening | 200.03.10 |
| Exterior | Porte Cochere/ Canopy | Landscape | ST | Create / Upgrade the "sense of arrival" by addressing landscaping and landscape features, adding landscape planters at places where they will not inconvenience guests, but will have a visual impact. Install a minimum 48 inch wide country bench constructed of wood or wood and cast iron at porte cochere per Brand Standards. | Prior to June 1, 2014 | 200.03.02 / 200.03.03 |
| Exterior | Walkways & Stairs | Exterior - Finishes | COND | Refinish/paint rusting stair steps and landings. | Prior to June 1, 2014 | 100.02.10 / 200.03.09 |
| Exterior | Walkways & Stairs | Maintenance | COND | Pressure wash/chemically clean walkways where rust stained and/or discolored. | Prior to June 1, 2014 | 200.03.07 / 200.03.09 |
| Exterior | Dumpster Enclosure | Exterior - Finishes | COND | Repair/refinish/paint storage shed to a like-new condition. | September 1, 2014 | 200.03.14 |
| Public Areas | Lobby | FF&E | COND | Professionally clean lobby hallway carpet outside public restrooms/pool area. If condition cannot be restored, replacement will be required. | 3 Months after opening | 300.01.02 |



O-46

| Area of work | Subject / Location of Work | Category of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|---|
| Public Areas | Lobby | FF&E | COND | Repair lobby vestibule wall vinyl where scuffed and/or discolored. | Prior to July 1, 2014 | 300.01.02 / 100.02.07 |
| Public Areas | Lobby | Finishes | COND | Repair/paint lobby ceiling where patched and/or discolored. | Prior to July 1, 2014 | 300.01.02 / 100.02.08 |
| Public Areas | Lobby | Finishes | COND | Refinish lobby vestibule and main lobby entrance doors where worn. If condition cannot restored, replacement is required. | Prior to June 1, 2014 | 300.01.02 / 100.02.10 |
| Public Areas | Lobby | FF&E | COND | Replace lobby area leisure seating package to include tables. | Prior to June 1, 2014 | 300.01.03 |
| Public Areas | Lobby | FF&E | ST | Replace/provide lobby/breakfast area window dressings per Brand Standard. | Prior to June 1, 2014 | 300.01.05 |
| Public Areas | Restrooms | FF&E | COND | Replace wall vinyl in Ladies public restroom where patched. Ensure a consistent appearance throughout. | Prior to June 1, 2014 | 400.02.10 |
| Public Areas | Restrooms | FF&E | COND | Replace sink drain ring in Men's public restroom. | 3 Months after opening | 400.02.10 |
| Public Areas | Stairs | FF&E | COND | Ce;anm carpet in stairwells prior to opening. If condition cannot be restored, carpet replacement will be required no later than 1 year after opening. | Within Noted Timeframe | 400.02.01 / 400.02.02 |
| Public Areas | Corridor | Finishes | COND | Refinish doors and frames (guestroom and service) throughout corridors where chipped and/or scuffed. | Prior to June 1, 2014 | 200.02.04 / 100.02.03 / 400.02.01 |
| Public Areas | Corridor | FF&E | COND | Replace wall vinyl in corridors where discolored and/or scuffed. | Prior to June 1, 2014 | 400.02.01 / 400.02.02 |
| Public Areas | Vending | Maintenance | COND | Deep clean floor tile grout in first floor vending area to eliminate discoloration. If discoloration remains, regrouting will be required. | Prior to June 1, 2014 | 400.01.06 |
| Public Areas | Business Center | Operational | ST | Provide a Business Center with equipment and capabilities as required per Brand Standards. | Prior to open | 500.02.01 / 500.02.02 |
| Public Areas | Fitness Room | Design & Construction | ST | Provide an on-site exercise room and equip as required per Brand Standards. | 1 Month after opening | 400.03.01 |
| Public Areas | Fitness Room | Maintenance | COND | Professionally clean carpet in exercise room to eliminate stains. If stains remain, replacement will be required. | 1 Month after opening | 400.03.06 |
| Public Areas | Indoor Pool | Finishes | COND | Refinish swimming pool deck where discolored, stained and/or peeling paint. | Prior to June 1, 2014 | 400.03.07 |
| Public Areas | Indoor Pool | Maintenance | COND | Deep clean ceramic wall tiles and grout in pool area where discolored. If discoloration remains, replacement is required. | Prior to June 1, 2014 | 400.03.18 |
| Public Areas | Indoor Pool | Finishes | COND | Paint/refinish ceiling and wall vent(s) and door(s) where rusty, discolored and/or scuffed. Replace door hinges where rusty. | Prior to June 1, 2014 | 400.03.10 |
| Public Areas | Indoor Pool | FF&E | COND | Replace swimming pool furniture package. | 6 Months after opening | 400.03.13 |
| Public Areas | Indoor Pool | Signage | ST | A swimming pool signage package should be posted indicating pool hours and any rules of usage. | 3 Months after opening | 400.03.08 |
| Public Areas | Meeting Room | Finishes | COND | Paint meeting room ceiling where stained. Ensure a consistent appearance throughout. | 3 Months after opening | 500.01.07 / 500.01.09 |
| Public Areas | Meeting Room | Finishes | COND | Paint walls, doors and doorframes in meeting room where scuffed, discolored, peeling paint and/or rusty. | 6 Months after opening | 500.01.07 / 500.01.09 |
| Public Areas | Breakfast Area | OS&E | CTO | Provide a Continental breakfast per Brand Standards. | Prior to open | 600.01.01 / 600.01.02 / 600.01.03 / 600.01.05 / 600.01.06 / 600.01.07 / 600.01.08 / 600.01.09 / 600.01.10 / 600.01.11 |
| Public Areas | Breakfast Area | Finishes | COND | Refinish wooden chairs and replace/reupholster seats to a like-new condition. If condition cannot be restored, total replacement will be required. | 3 Months after opening | 600.01.09 |



| Area of work | Subject / Location of Work | Category of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|---|
| Guestrooms | General | Operational | ST | Baymont Inn & Suites requires property to provide 2 two-room suites consisting of a sleeping room and a leisure room. All FF&E is required to comply with pre-approved Baymont design schemes. | 4 Months after opening | 700.07.01 |
| Guestrooms | Entry Door | Finishes | COND | Refinish doors and frames (entrance and bathroom) where worn, scuffed and/or peeling paint. | 3 Months after opening | 700.06.01 |
| Guestrooms | Guestrooms | FF&E | COND | Replace ceiling tiles where stained and/or discolored. Ensure replacements match remaining tiles exactly, or total replacement will be required. | 3 Months after opening | 100.02.10 |
| Guestrooms | Guestrooms | Finishes | COND | Repair/paint walls where patched and/or scuffed. | 2 Months after opening | 700.02.05 |
| Guestrooms | Guestrooms | FF&E | COND | Replace carpet in guestrooms with older green carpet. | Prior to July 1, 2014 | 700.02.04 |
| Guestrooms | Guestroom Casegoods | FF&E- Casegoods | COND | Refinish casegoods package where worn, chipped and/or scuffed to a like-new condition. If condition cannot be restored, total replacement will be required. | Prior to July 1, 2014 | 700.02.06 / 700.02.08 / 700.02.09 / 700.02.10 / 700.02.11 / 700.02.12 / 700.02.13 |
| Guestrooms | Guestroom Casegoods | Maintenance | COND | Professionally clean leisure chairs and/or ottomans where stained. If stains remain, replacement will be required. | 2 Months after opening | 700.02.12 |
| Guestrooms | Guestroom Lighting / Power | FF&E- Lighting | COND | Provide desk lamp(s) where missing per Brand Standards. | Prior to open | 700.02.17 |
| Guestrooms | Guestroom Equipment & Supplies | OS&E- Televisions | ST | Conceal television power cords where exposed. | 2 Months after opening | 700.05.01 / 700.05.02 / 700.05.03 / 700.05.04 / 700.06.06 |
| Guestrooms | Guestroom Window Dressing | FF&E | COND | Clean sheers where stained. If stains remain, replacement is required. | 3 Months after opening | 700.02.14 |
| Guestrooms | Guestroom Bed / Bedding / Linen | OS&E- Bedsets | COND | Replace bedsets (mattresses and boxsprings) where exceeding 10 years of age. If condition grades a "major" on a quality assurance evaluation replacement per Brand Standards will be required. | Prior to open | 700.03.03 |
| Guestrooms | Guestroom Bed / Bedding / Linen | OS&E | COND | Replace bed toppings per Brand Standards. | 3 Months after opening | 700.03.00 |
| Guestrooms | Guestroom Bed / Bedding / Linen | OS&E | ST | Provide a complete inventory of linen to include sheets, pillows, pillowcases, blankets, mattress pads and complete inventory of terry stock to include washcloths, bath mats and bath and hand towels per Brand Standards. | 3 Months after opening | 700.03.04 / 700.03.05 / 700.03.08 / 700.03.09 / 700.06.06 |
| Guestrooms | Guestroom Closet | OS&E | ST | Provide traditional hook style hangers in closets. Security hangers are not acceptable. | 4 Months after opening | 700.04.01 / 700.04.02 |
| Guestrooms | Guestroom HVAC | Finishes | COND | Repair/replace older GE Zoneline PTAC units where damaged and/or missing grills. | Prior to July 1, 2014 | 700.01.02 / 100.02.03 |
| Guestrooms | Guest Bath | FF&E | COND | Replace bathroom wall vinyl where scuffed, discolored and/or torn. | Prior to July 1, 2014 | 700.06.02 |
| Guestrooms | Guest Bath | FF&E | COND | Replace plumbing fixtures/trim (sinks and bathtubs) where tarnished, rusty and/or corroded. | 3 Months after opening | 700.08.04 |
| Guestrooms | Guest Bath | Maintenance | COND | Replace toilet seat/lid units where chipped and/or incorrect size. | 3 Months after opening | 700.06.04 |
| Guestrooms | Guest Bath Tub / Shower | FF&E | COND | Replace bathtubs where worn, peeling and/or scuffed. The installation of commercial grade liners or professionally restoring surfaces to like-new condition are acceptable alternatives. | 2 Months after opening | 700.06.04 |
| Guestrooms | Guest Bath Tub / Shower | FF&E | ST | Provide Brand approved shower curtains with window per Brand Standards. | 3 Months after opening | 700.06.04 |
| Guestrooms | Guest Bath Supplies | OS&E | CTO | Provide bath amenities package per Brand Standards. | Prior to open | 300.03.08 / 700.08.95 / 700.04.07 |
| Back of House | Training / Orientation | Training | ST | Property manager is required to be Wyndham Rewards certified and property must fully comply with all Wyndham Rewards requirements. | Prior to open | 100.01.12 / 100.04.15 |

| Area of work | Subject / Location of Work | Category of Work | CTO ST COND | Scope of Work | Complete By | Brand Standard Reference |
|---|---|---|---|---|---|---|
| Back of House | Internet Access | Technology | CTO | Provide complimentary high-speed internet access in all guestrooms and interior public areas through an approved vendor per Brand Standards. | Prior to open | 100.03.01 |
| Back of House | Property Management System | Technology | CTO | Replace existing property management system with the WynGuest system. | Prior to open | 100.03.08 / 100.03.10 |

# **EXHIBIT B**

## GUARANTY

To induce BAYMONT FRANCHISE SYSTEMS, INC. its successors and assigns ("you") to sign the Franchise Agreement (the "Agreement") with the party named as the "Franchisee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Franchisee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Franchisee's obligations under the Agreement, including any amendments will be punctually paid and performed.

Upon default by Franchisee and notice from you we will immediately make each payment and perform or cause Franchisee to perform, each unpaid or unperformed obligation of Franchisee *under the Agreement*. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Franchisee, or settle, adjust or compromise any claims against Franchisee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue, Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Franchisee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original *but all of which together shall constitute one in the same instrument.*

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

GUARANTORS:

Name: **Nilesh Patel**
Address: **64 Brookside Drive**
**Holland, PA 18966**

Dated:  November 20, 2013

Virginia - 40

# EXHIBIT C

# WYNDHAM

### HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 ● fax (800) 880-9445
www.wyndhamworldwide.com

January 21, 2015

**VIA 2 DAY DELIVERY METHOD**

Mr. Richard M. Saltzman
Giambrone & Saltzman, LLC
710 US Highway 46E, Suite 210
Fairfield, NJ 07004

RE:   ACKNOWLEDGMENT OF TERMINATION of the Franchise Agreement for Baymont® System Unit #47614-03583-2 located in Gettysburg, PA (the "Facility")

Dear Mr. Saltzman:

Baymont Franchise Systems, Inc. ("we" or "us") has received your letter dated December 31, 2014, advising us that on January 1, 2015, (the "Termination Date"), ZRII, LLC, (the "Franchisee") stopped operating the Facility as a Baymont facility.  Accordingly, we acknowledge that the Franchise Agreement, dated December 3, 2013 (the "Agreement") has terminated.

The Agreement requires the Franchisee to perform certain post-termination obligations.  In addition to other obligations specified in the Agreement, by no later than ten (10) days from the delivery date of this letter, the Franchisee must (a) remove all signage and other items bearing the Baymont Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Baymont facility; and (d) remove the Baymont Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines.   The Franchisee must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified.  Franchisee must immediately return to us all training documents, operating manuals and other proprietary material.

Because the Agreement has terminated, the Franchisee must pay us Liquidated Damages of $68,000.00, as specified in Section 18.3 of the Agreement.  The Franchisee must also pay any outstanding Recurring Fees and any other fees and charges through the Termination Date.  We estimate that, as of January 1, 2015, the Franchisee owes us $56,792.19 in such fees and charges.  Please pay us this amount within fourteen (14) days.  Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to Franchisee's Guarantor.

# WYNDHAM

### HOTEL GROUP

















Mr. Richard M. Saltzman
January 21, 2015
Page Two

Please know that, because the Agreement has terminated, the Franchisee has also lost the right to continue to use the seamless interface version of its property management system. The Franchisee must now make arrangements with the software vendor for a new license to use the property management system. If the Facility has WynGuest system installed, please be advised that due to the termination the Franchisee will have no functionality from the system. Should the Franchisee wish to continue using an independent version of the software, Franchisee may contact Sabre at 877-520-3646. If the property is planning to migrate to another property management system, contact its provider to expedite the installation. If the Franchisee would like to inquire about the data maintained in the system, Franchisee may contact Hotel Technology Client Support at 506-646-2521 to obtain reporting of that data.

Should the Franchisee have any questions regarding this matter, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753-7602.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosures

cc:     Nilesh Patel (Legal Contact) – 871 York Road, Gettysburg, PA 17325
        Nilesh Patel (Guarantor) – 64 Brookside Drive, Holland, PA 18966
        Patrick Breen
        Charlene Martin
        Joe Maida
        Michael Piccola

## ITEMIZED STATEMENT

Report Date: 21-Jan-2015

| As of Date (DD-MMM-YYYY) | : | 01-Jan-2015 |
|---|---|---|
| Customer No | : | 47614-03583-02-BAY |
| Category Set | : | |
| Category Group | : | |
| Group No | : | |
| Bankruptcy | : | No Bankruptcy Sites |
| Disputed | : | No |
| Finance Charges Included | : | Yes |
| | | |
| Customer No | : | 47614-03583-02-BAY |
| Address | : | 871 York Road,Gettysburg,PA,17325,US |
| As of Date | : | 01-Jan-2015 |



| Mon-Year | Invoice No | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| JUN-2014 | 10739214 | 06/05/2014 | GUEST SATISFACTION | | 217.60 | 0.00 | 14.14 | 231.74 |
| | 10739371 | 06/05/2014 | GUEST SATISFACTION | | 217.60 | 0.00 | 4.63 | 222.23 |
| | 10739433 | 06/05/2014 | GUEST SATISFACTION | | 217.60 | 0.00 | 14.14 | 231.74 |
| | 10739873 | 06/05/2014 | GUEST SATISFACTION | | 11.78 | 0.00 | 4.01 | 15.79 |
| | 10740525 | 06/05/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 3.40 | 163.40 |
| | 10740539 | 06/05/2014 | GUEST SATISFACTION | | 217.60 | 0.00 | 9.43 | 227.03 |
| | 10740540 | 06/05/2014 | GUEST SATISFACTION | | 217.60 | 0.00 | 11.80 | 220.40 |
| | 10740541 | 06/05/2014 | GUEST SATISFACTION | | 217.60 | 0.00 | 14.14 | 231.74 |
| | 10740543 | 06/05/2014 | GUEST SATISFACTION | | 217.60 | 0.00 | 14.14 | 231.74 |
| | 10742167 | 06/19/2014 | GUEST SATISFACTION | | 217.60 | 0.00 | 12.61 | 230.21 |
| | 10743222 | 06/19/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 9.28 | 169.28 |
| | 1478603 | 06/25/2014 | GDS & INTERNET BKGS | | 379.65 | 0.00 | 26.19 | 411.72 |
| | 328390 | 06/22/2014 | WYNREWARDS CRDT | | -230.59 | 0.00 | 0.00 | -230.59 |
| | 329066 | 06/22/2014 | WYNREWARDS 5% | | 1,690.09 | 0.00 | 118.52 | 1,832.70 |
| | 42906616 | 06/30/2014 | 5034A-WYNGUEST SUBSCRIPTION | | 500.00 | 30.00 | 35.26 | 573.48 |
| | 42922504 | 06/30/2014 | Actual-1001A-ROYALTY FEE | | 4,975.42 | 0.00 | 330.86 | 5,383.40 |
| | 42922566 | 06/30/2014 | Actual-1201A-MARKETING FEE | | 1,463.36 | 0.00 | 97.32 | 1,583.36 |
| | TA0478603 | 06/25/2014 | T/A COMMISSIONS | | 134.54 | 0.00 | 9.29 | 145.92 |
| | TC0478603 | 06/25/2014 | T/A COMM SERVICE CHG | | 33.37 | 0.00 | 2.31 | 36.20 |
| | TM0478603 | 06/25/2014 | MEMBER BENEFIT COMM | | 248.77 | 0.00 | 17.16 | 289.79 |
| | TR0478603 | 06/25/2014 | TMC / CONSORTIA | | 6.52 | 0.00 | 0.45 | 7.07 |
| | | | **Sub Total:** | | 11,273.71 | 30.00 | 749.08 | 12,197.35 |
| | | | | | | | | |
| JUL-2014 | 10745930 | 07/03/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 10.40 | 172.88 |
| | 1485337 | 07/24/2014 | GDS & INTERNET BKGS | | 358.55 | 0.00 | 19.55 | 383.66 |
| | 30928710 | 07/23/2014 | 2014 BAYMA DUES | | 960.00 | 0.00 | 52.80 | 1,027.68 |
| | 329393 | 07/22/2014 | WYNREWARDS CRDT | | -135.00 | 0.00 | 0.00 | -135.00 |
| | 329887 | 07/22/2014 | WYNREWARDS 5% | | 1,677.85 | 0.00 | 93.12 | 1,796.98 |
| | 42934701 | 07/31/2014 | 5034A-WYNGUEST SUBSCRIPTION | | 500.00 | 30.00 | 27.04 | 565.26 |
| | 42951853 | 07/31/2014 | Actual-1001A-ROYALTY FEE | | 5,137.53 | 0.00 | 262.69 | 5,479.85 |
| | 42951855 | 07/31/2014 | Actual-1201A-MARKETING FEE | | 1,511.04 | 0.00 | 77.26 | 1,611.72 |

Page 1 of 3

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | TA0485337 | 07/24/2014 | T/A COMMISSIONS | | 267.20 | 0.00 | 14.58 | 285.90 |
| | TC0485337 | 07/24/2014 | T/A COMM SERVICE CHG | | 67.65 | 0.00 | 3.69 | 72.39 |
| | TM0485337 | 07/24/2014 | MEMBER BENEFIT COMM | | 306.90 | 0.00 | 16.72 | 328.38 |
| | TR0485337 | 07/24/2014 | TMC / CONSORTIA | | 10.80 | 0.00 | 0.59 | 11.56 |
| | | | Sub Total: | | 10,822.52 | 30.00 | 578.42 | 11,601.26 |
| | | | | | | | | |
| AUG-2014 | 1492061 | 08/25/2014 | GDS & INTERNET BKGS | | 458.90 | 0.00 | 17.60 | 481.58 |
| | 330221 | 08/22/2014 | WYNREWARDS CRDT | | -583.32 | 0.00 | 0.00 | -583.32 |
| | 330439 | 08/22/2014 | WYNREWARDS 5% | | 1,208.00 | 0.00 | 48.32 | 1,275.04 |
| | 42966327 | 08/31/2014 | 5034A-WYNGUEST SUBSCRIPTION | | 500.00 | 30.00 | 18.82 | 557.04 |
| | 42981903 | 08/31/2014 | Actual-1001A-ROYALTY FEE | | 4,375.66 | 0.00 | 155.34 | 4,598.82 |
| | 42982090 | 08/31/2014 | Actual-1201A-MARKETING FEE | | 1,288.96 | 0.00 | 45.68 | 1,352.59 |
| | TA0492061 | 08/25/2014 | T/A COMMISSIONS | | 334.97 | 0.00 | 12.90 | 353.06 |
| | TC0492061 | 08/25/2014 | T/A COMM SERVICE CHG | | 47.79 | 0.00 | 1.84 | 50.37 |
| | TM0492061 | 08/25/2014 | MEMBER BENEFIT COMM | | 156.94 | 0.00 | 6.05 | 165.42 |
| | TR0492061 | 08/25/2014 | TMC / CONSORTIA | | 13.47 | 0.00 | 0.52 | 14.20 |
| | | | Sub Total: | | 7,797.37 | 30.00 | 307.07 | 8,264.80 |
| | | | | | | | | |
| SEP-2014 | 10761813 | 09/04/2014 | GUEST SATISFACTION | | 95.38 | 0.00 | 3.20 | 100.07 |
| | 10762504 | 09/04/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 5.36 | 167.84 |
| | 10764588 | 09/18/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 2.24 | 164.72 |
| | 10766235 | 09/18/2014 | GUEST SATISFACTION | | 100.00 | 0.00 | 1.40 | 102.95 |
| | 1498813 | 09/26/2014 | GDS & INTERNET BKGS | | 281.95 | 0.00 | 6.35 | 292.67 |
| | 30941508 | 09/08/2014 | 2015 BAYMA Dues | | 960.00 | 0.00 | 0.00 | 960.00 |
| | 330896 | 09/22/2014 | WYNREWARDS CRDT | | -180.00 | 0.00 | 0.00 | -180.00 |
| | 331492 | 09/22/2014 | WYNREWARDS 5% | | 1,269.55 | 0.00 | 26.18 | 1,315.41 |
| | 42991521 | 09/30/2014 | WYNGUEST SUBSCRIPTION:Franchisee;:4020303:01-JAN-14:31-DEC-16: | | 500.00 | 30.00 | 10.87 | 549.09 |
| | 43009031 | 09/30/2014 | Actual-1001A-ROYALTY FEE | | 3,036.13 | 0.00 | 62.24 | 3,145.43 |
| | 43009200 | 09/30/2014 | Actual-1201A-MARKETING FEE | | 892.98 | 0.00 | 18.30 | 925.12 |
| | TA0498813 | 09/26/2014 | T/A COMMISSIONS | | 502.13 | 0.00 | 11.30 | 521.21 |
| | TC0498813 | 09/26/2014 | T/A COMM SERVICE CHG | | 73.63 | 0.00 | 1.65 | 76.43 |
| | TM0498813 | 09/26/2014 | MEMBER BENEFIT COMM | | 156.46 | 0.00 | 3.52 | 162.41 |
| | TR0498813 | 09/26/2014 | TMC / CONSORTIA | | 141.37 | 0.00 | 3.18 | 148.74 |
| | | | Sub Total: | | 8,149.59 | 30.00 | 155.80 | 8,450.09 |
| | | | | | | | | |
| OCT-2014 | 1505698 | 10/23/2014 | GDS & INTERNET BKGS | | 286.95 | 0.00 | 2.58 | 293.98 |
| | 30951986 | 10/10/2014 | ONLINE LRNG LIBRARY | | 60.00 | 0.00 | 0.93 | 61.86 |
| | 30958981 | 10/17/2014 | GLOBAL CONFERENCE | | 1,049.00 | 0.00 | 0.00 | 1,049.00 |
| | 331924 | 10/22/2014 | WYNREWARDS CRDT | | -728.18 | 0.00 | 0.00 | -728.18 |
| | 332176 | 10/22/2014 | WYNREWARDS 5% | | 1,622.56 | 0.00 | 15.41 | 1,663.12 |
| | 43024512 | 10/31/2014 | 5034A-WYNGUEST SUBSCRIPTION | | 500.00 | 30.00 | 2.65 | 540.87 |
| | 43041811 | 10/31/2014 | Actual-1001A-ROYALTY FEE | | 4,454.04 | 0.00 | 22.27 | 4,545.35 |
| | 43042009 | 10/31/2014 | Actual-1201A-MARKETING FEE | | 1,310.01 | 0.00 | 6.55 | 1,338.87 |
| | TA0505698 | 10/23/2014 | T/A COMMISSIONS | | 159.45 | 0.00 | 1.44 | 163.36 |
| | TC0505698 | 10/23/2014 | T/A COMM SERVICE CHG | | 35.21 | 0.00 | 0.32 | 36.08 |
| | TM0505698 | 10/23/2014 | MEMBER BENEFIT COMM | | 213.01 | 0.00 | 1.92 | 218.23 |

Page 2 of 3

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | TR0505698 | 10/23/2014 | TMC / CONSORTIA | | 2.86 | 0.00 | 0.03 | 2.93 |
| | | | Sub Total: | | 8,964.91 | 30.00 | 54.10 | 9,183.47 |
| NOV-2014 | 10776289 | 11/05/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.32 | 162.80 |
| | 10776783 | 11/09/2014 | GUEST SATISFACTION | | 100.00 | 0.00 | 0.20 | 101.75 |
| | 10777458 | 11/12/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.00 | 162.32 |
| | 10777980 | 11/12/2014 | GUEST SATISFACTION | | 30.77 | 0.00 | 0.00 | 31.22 |
| | 10778002 | 11/12/2014 | GUEST SRVCS TRANSACTION CHARGE | | 160.00 | 0.00 | 0.00 | 162.32 |
| | 10778037 | 11/12/2014 | GUEST SATISFACTION | | 278.22 | 0.00 | 0.00 | 282.25 |
| | 1512301 | 11/20/2014 | GDS & INTERNET BKGS | | 416.05 | 0.00 | 0.00 | 420.42 |
| | 332816 | 11/22/2014 | WYNREWARDS CRDT | | -255.67 | 0.00 | 0.00 | -255.67 |
| | 333181 | 11/22/2014 | WYNREWARDS 5% | | 1,263.84 | 0.00 | 0.00 | 1,275.85 |
| | 43051899 | 11/30/2014 | 5034A-WYNGUEST SUBSCRIPTION | | 500.00 | 30.00 | 0.00 | 532.99 |
| | 43068017 | 11/30/2014 | Accrual-1001A-ROYALTY FEE | * | 1,596.81 | 0.00 | 0.00 | 1,605.59 |
| | 43068020 | 11/30/2014 | Accrual-1201A-MARKETING FEE | * | 469.65 | 0.00 | 0.00 | 472.23 |
| | TA0512301 | 11/20/2014 | T/A COMMISSIONS | | 180.47 | 0.00 | 0.00 | 182.36 |
| | TC0512301 | 11/20/2014 | T/A COMM SERVICE CHG | | 36.07 | 0.00 | 0.00 | 36.45 |
| | TM0512301 | 11/20/2014 | MEMBER BENEFIT COMM | | 227.19 | 0.00 | 0.00 | 229.58 |
| | TR0512301 | 11/20/2014 | TMC / CONSORTIA | | 2.56 | 0.00 | 0.00 | 2.59 |
| | | | Sub Total: | | 5,325.96 | 30.00 | 0.52 | 5,404.98 |
| DEC-2014 | 1525044 | 12/30/2014 | GDS & INTERNET BKGS | | 184.60 | 0.00 | 0.00 | 184.60 |
| | 333506 | 12/22/2014 | WYNREWARDS CRDT | | -90.00 | 0.00 | 0.00 | -90.00 |
| | 333629 | 12/22/2014 | WYNREWARDS 5% | | 185.38 | 0.00 | 0.00 | 185.38 |
| | 43079528 | 12/31/2014 | 5034A-WYNGUEST SUBSCRIPTION | | 500.00 | 30.00 | 0.00 | 530.00 |
| | 43082728 | 12/31/2014 | Accrual-1001A-ROYALTY FEE | * | 355.13 | 0.00 | 0.00 | 355.13 |
| | 43084476 | 12/31/2014 | Accrual-1201A-MARKETING FEE | * | 104.45 | 0.00 | 0.00 | 104.45 |
| | TA0517585 | 12/17/2014 | T/A COMMISSIONS | | 146.44 | 0.00 | 0.00 | 146.44 |
| | TA0525044 | 12/30/2014 | T/A COMMISSIONS | | 88.92 | 0.00 | 0.00 | 88.92 |
| | TC0525044 | 12/30/2014 | T/A COMM SERVICE CHG | | 16.65 | 0.00 | 0.00 | 16.65 |
| | TM0517585 | 12/17/2014 | MEMBER BENEFIT COMM | | 68.67 | 0.00 | 0.00 | 68.67 |
| | TM0525044 | 12/30/2014 | MEMBER BENEFIT COMM | | 100.00 | 0.00 | 0.00 | 100.00 |
| | | | Sub Total: | | 1,669.24 | 30.00 | 0.00 | 1,699.24 |
| | | | Grand Total: | | 53,994.30 | 210.00 | 1,844.99 | 56,792.19 |

Requested By: Kristine Violette

\* Please note the accruals on your account are estimates.
 Make sure to promptly submit your actual gross room revenue and rooms sold.

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following within 10 days from the delivery of the Acknowledgment of Termination letter:**

1.    Remove, replace or cover with an opaque cover the primary Facility signage.

2.    Remove all interior signage that contains Baymont Marks.

3.    Change advertising billboards to remove Baymont Marks.

4.    Stop answering Facility telephone as Baymont guest lodging facility.

5.    Remove Baymont name and Marks from any domain name, advertising and brochures.

6.    Return to us all confidential operations and training manuals.

7.    Remove the Baymont name and Marks from the following items:

> Stationery, pads and pens
> Directories and brochures
> Business cards
> Folios and registration cards
> Do-not-disturb cards
> Comment cards
> Telephone plates
> Telephone dialing instructions
> TV channel ID plates
> Rate/law cards
> Door signage
> Soap/shampoo
> Key tags
> Credit card imprinter
> Laundry bags
> Name tags/uniforms
> Ice buckets/trays
> Ashtrays/matches
> Plaques
> Guest checks/receipts
> Menus

8.    Paint over or remove any distinctive Baymont trade dress, paint schemes or architectural features.

9.    It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Baymont facility.

10.   We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

 **Shipment Receipt**

**Transaction Date:** 21 Jan 2015                **Tracking Number:**      1Z22445X0294936989

---

**1 |  Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Giambrone & Saltzman, LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Mr. Richard M. Saltzman | Kristine Violette | Kristine Violette |
| 710 US Highway 46E | 22 Sylvan Way | 22 Sylvan Way |
| Suite 210 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| FAIRFIELD NJ 07004 | Telephone:9737537204 | Telephone:9737537204 |

---

**2 |  Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.  Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 |

---

**3 |  UPS Shipping Service and Shipping Options**

*Service:*                        *UPS 2nd Day Air*
**Shipping Fees Subtotal:**        15.41 USD
   **Transportation**              14.40 USD
   **Fuel Surcharge**               1.01 USD

---

**4 |  Payment Information**

Bill Shipping Charges to:                        Shipper's Account 22445X

| Charges: | 15.41 USD |
|---|---|
| **A discount has been applied to the Daily rates for this shipment** | |
| Negotiated Charges: | 7.06 USD |
| Total Charges: | 7.06 USD |

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

UPS CampusShip: Shipment Receipt                                                    Page 1 of 1

 **Shipment Receipt**

**Transaction Date:** 21 Jan 2015          **Tracking Number:**        1Z22445X0290591199

┌─────────────────────────────────────────────────────────────────────────────────────┐
**1** Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| ZRII, LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Nilesh Patel | Kristine Violette | Kristine Violette |
| 871 York Road | 22 Sylvan Way | 22 Sylvan Way |
| GETTYSBURG PA 173257501 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| | Telephone:9737537204 | Telephone:9737537204 |

**2** Package Information

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.  Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 |

**3** UPS Shipping Service and Shipping Options

| Service: | UPS 2nd Day Air |
|---|---|
| Shipping Fees Subtotal: | 15.41 USD |
|    Transportation | 14.40 USD |
|    Fuel Surcharge | 1.01 USD |

**4** Payment Information

Bill Shipping Charges to:                      Shipper's Account 22445X

| Charges: | 15.41 USD |
|---|---|

**A discount has been applied to the Daily rates for this shipment**

| Negotiated Charges: | 7.06 USD |
|---|---|
| Total Charges: | 7.06 USD |

Note: Your invoice may vary from the displayed reference rates.

\* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

UPS CampusShip: Shipment Receipt                                              Page 1 of 1

 **Shipment Receipt**

**Transaction Date:** 21 Jan 2015          **Tracking Number:**          1Z22445X0293213207

**1  Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| ZRII, LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Nilesh Patel | Kristine Violette | Kristine Violette |
| 64 Brookside Drive | 22 Sylvan Way | 22 Sylvan Way |
| HOLLAND PA 189662223 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| Residential | Telephone:9737537204 | Telephone:9737537204 |

**2  Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.  Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 |

**3  UPS Shipping Service and Shipping Options**

| Service: | UPS 2nd Day Air |
|---|---|
| Shipping Fees Subtotal: | 19.15 USD |
| Transportation | 14.40 USD |
| Fuel Surcharge | 1.25 USD |
| Residential Surcharge | 3.50 USD |

**4  Payment Information**

Bill Shipping Charges to:                 Shipper's Account 22445X

Charges:                                                              19.15 USD

**A discount has been applied to the Daily rates for this shipment**

Negotiated Charges:                                                    9.49 USD
Total Charges:                                                         9.49 USD

Note: Your invoice may vary from the displayed reference rates.

* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.